Predrag STEVIC, Petitioner-Appellant,

v.

Charles SAVA, District Director, Immigration and Naturalization Service, New York Office, Respondent-Appellee.

Predrag STEVIC, Petitioner,

v.

IMMIGRATION AND NATURALIZATION SERVICE, Respondent.

Nos. 574–575, Dockets 81–2288, 81–4162.

United States Court of Appeals, Second Circuit.

Argued Jan. 13, 1982.

Decided May 5, 1982.

Opinion on Denial of Rehearing July 29, 1982.

Ann L. Ritter, New York City, for petitioner-appellant and petitioner.

Michael D. Patrick, Sp. Asst. U. S. Atty., S. D. N. Y., New York City (John S. Martin, Jr., U. S. Atty., Thomas H. Belote, Sp. Asst. U. S. Atty., Peter C. Salerno, Asst. U. S. Atty., New York City, of counsel), for respondent-appellee and respondent.

Before OAKES, NEWMAN and WINTER, Circuit Judges.

RALPH K. WINTER, Jr., Circuit Judge:

This is a consolidation of (1) an appeal from the dismissal of a petition for a writ of habeas corpus, and (2) a petition for review of a final order of deportation of the Board of Immigration Appeals ("BIA"). The major issue is whether the Refugee Act of 1980 changes the legal standard for aliens seeking political asylum in order to avoid deportation. We hold that it does and reverse the BIA's order denying the motion to reopen.

## BACKGROUND

The petitioner-appellant, Predrag Stevic, is a citizen of Yugoslavia. He entered the United States on June 8, 1976, with a visa permitting him to remain until July 25, 1976. The purpose of the trip was to visit his sister who had married a United States citizen and was a permanent resident here. When his visa expired, Stevic neither left nor sought an extension of time. Deportation proceedings were commenced. A hearing was held on December 16, 1976, before Immigration Judge Anthony D. Petrone. Stevic's counsel neither contested his deportability nor requested political asylum. Rather, Stevic consented to "voluntary departure" within sixty days and designated Yugoslavia as the country to which he desired to be deported. Judge Petrone ordered "voluntary departure" for Stevic on or before February 16, 1977. No appeal was taken. When the time came, Stevic again neither departed nor requested an extension of time.

On January 8, 1977, Stevic married Mirjana Doichin, a United States citizen. Thereafter, she filed a "Petition to Classify Status of Alien Relative for Issuance of Immigration Visa" on Form I–130 ("I–130 Petition") with the Immigration and Naturalization Service ("INS"), the first step in obtaining an "adjustment of status" to lawful permanent residence status.[1] On April 5, 1977, the I–130 Petition was approved by the INS. Five days later, Stevic's wife was killed in an automobile accident. As a result, approval of the I–130 Petition was automatically revoked under 8 C.F.R. § 205.1(a)(2).[2]

---

1. 8 U.S.C. § 1225 provides that once an I–130 Petition is granted, the alien may apply to adjust his status to that of "lawfully admitted for permanent residence" in the United States.

2. 8 C.F.R. § 205.1(a)(2) reads in part:
   The approval of a[n] [I–130] petition is revoked ... if any of the following circumstances occur ... before the decision on his application [for adjustment of status to permanent resident] becomes final:
       *    *    *    *    *    *
   (2) Upon the death of the petitioner....

Stevic requested reinstatement of the I–130 Petition on humanitarian grounds pursuant to 8 C.F.R. § 205.1(a)(3).[3] On August 11, 1977, the INS's Chicago District Director denied that request, stating that Stevic had "no immediate relatives or other equity in the United States." This was in part untrue since Stevic's sister was a permanent resident in this country. Stevic was given notice to surrender for deportation on August 24, 1977. He did not seek review of that decision.

Stevic did not surrender for deportation. Instead, he moved to reopen the deportation proceedings for the purpose of filing an application for withholding of deportation to Yugoslavia under Section 243(h) of the Immigration and Nationality Act of 1952, 8 U.S.C. § 1253(h).[4] In this motion, Stevic raised for the first time his fear of persecution should he be deported to Yugoslavia. Stevic claimed that, since his marriage, he had become active in an emigre anti-Communist organization, Ravna Gora. He stated that his wife's father, an American citizen, and also a member of Ravna Gora, was imprisoned while visiting Yugoslavia as a tourist in 1974. According to Stevic's habeas petition, his father-in-law was imprisoned for three years, an experience which caused him to commit suicide upon release. Stevic presented evidence of his own activities in other Serbian emigre organizations and of the hostility of the Yugoslav government to these organizations and their members. While the motion to reopen was pending, Stevic applied to the Chicago District Director for asylum. That application was denied on August 1, 1979. On October 17, 1979, Judge Petrone denied Stevic's motion to reopen. Stevic appealed to the BIA. On January 18, 1980, the BIA dismissed Stevic's appeal, stating:

A motion to reopen based on a section 243(h) claim of persecution must contain prima facie evidence that there is a clear probability of persecution to be directed at the individual respondent. *See Cheng Kai Fu v. INS*, 386 F.2d 750 (2d Cir. 1967), *cert. denied*, 390 U.S. 1003 [88 S.Ct. 1247, 20 L.Ed.2d 104] (1968). Although the applicant here claims to be eligible for withholding of deportation which was not available to him at the time of his deportation hearing, he has not presented any evidence which would indicate that he will be singled out for persecution.

Stevic did not appeal this decision.

Stevic was then served with a notice to surrender for deportation on February 24, 1981. Once again, he neither complied nor requested an extension of time. On July 17, 1981, he was apprehended in Chicago and transported to J.F.K. International Airport in New York for deportation. During a transfer to a connecting flight for Yugoslavia, Stevic attempted to escape and was detained by the INS. Deportation was rescheduled. On July 21, 1981, Stevic petitioned for a writ of habeas corpus in the United States District Court for the Southern District of New York. The District Court, limiting its consideration to whether the August 11, 1977 decision denying humanitarian relief was an abuse of discretion, denied the petition. Stevic appealed.

Stevic also filed a second motion to reopen his deportation proceedings before the BIA. On September 3, 1981, the BIA denied that motion. It stated:

The position of this motion is identical to the prior one; ... No showing has been made that the submitted information was not available to the respondent prior to this date, nor that conditions in Yugoslavia have substantially changed since he filed the first motion ....

\*   \*   \*   \*   \*   \*

In addition, we also conclude that the respondent has failed to make out a prima facie showing that he will be singled out for persecution if deported to Yugoslavia. A motion to reopen based on a section 243(h) claim of persecution must

---

**3.** 8 C.F.R. § 205.1(a)(3) reads in part:

The approval of a[n] [I–130] petition is revoked ... if any of the following circumstances occur ... before the decision on his application [for adjustment of status to permanent resident] becomes final:

\*   \*   \*   \*   \*   \*

(3) Upon the death of the petitioner unless the Attorney General in his discretion determines that for humanitarian reasons revocation would be inappropriate.

**4.** On that date, 8 U.S.C. § 1253(h) read in part:

(h) the Attorney General is authorized to withhold deportation of any alien within the United States to any country in which in his opinion the alien would be subject to persecution on account of race, religion, or political opinion and for such period of time as he deems to be necessary for such reasons.

contain prima facie evidence that there is a clear probability of persecution to be directed at the individual respondent. *See Cheng Kai Fu v. INS*, 386 F.2d 750 (2d Cir. 1967), *cert. denied*, 390 U.S. 1003 [88 S.Ct. 1247, 20 L.Ed.2d 104] (1968); *Matter of McMullen*, Interim Decision 2831 (BIA 1981) . . . .

Stevic petitions for review of that decision.

The appeal from the District Court and the petition for review of the BIA decision have been consolidated.

## APPEAL FROM THE DISTRICT COURT

■ In his petition for a writ of habeas corpus,[5] Stevic challenged the validity of the denial of humanitarian relief by the INS's Chicago District Director on August 11, 1977.

Like the District Court, our review is limited to determining whether that decision is an abuse of discretion or unsupported by substantial evidence. The granting or denying of humanitarian relief is a matter for the exercise of discretion by the Attorney General and his decision may not be overturned by a reviewing court "simply because it may prefer another interpretation . . . ." *INS v. Wang*, 450 U.S. 139, 144, 101 S.Ct. 1027, 1031, 67 L.Ed.2d 123 (1981).

The District Director's decision is by no means invulnerable, since the statement that Stevic has no immediate relatives in this country is a plain mistake of fact. Stevic's immigration record plainly indicated that his original purpose in entering the United States was to visit his sister, then and now a permanent resident.

Judge Knapp noted the Director's error, but declined to grant relief since no effort was made at the time either to bring the error to the Director's attention or to appeal. We also decline to act on the basis of a factual error in a discretionary decision

now some four and one-half years old. Stevic has had more than ample opportunity to bring the error to the Director's attention or challenge it before the BIA. Since we cannot say that, but for the Director's prior error, humanitarian relief would have been granted or that such relief is mandatory in light of the true facts, the only legitimate function the writ might serve would be to permit Stevic to file a renewed application to reinstate the I–130 Petition. Stevic, however, has been free to make such an application for years, including the period during which this appeal has been pending, but has not done so. For those reasons, we affirm Judge Knapp.

## REVIEW OF THE BIA DECISION

The September 3, 1981 decision of the BIA raises more complex issues.[6] The BIA considered Stevic's motion to reopen the deportation proceedings as raising essentially the same claims as were disposed of by the denial of his first motion to reopen on January 18, 1980. Stevic argues that, subsequent to the first motion to reopen, but prior to the second, the Refugee Act of 1980, Pub.L.No.96–212, 94 Stat. 102 (1980), changed the legal standard relating to applications for political asylum. If he is correct, the BIA decision must be reversed.

Although the matter is hardly free from doubt, as the ensuing discussion reveals, we agree with Stevic's statutory argument. Since the Refugee Act of 1980 is the end product of an evolutionary process in the law of asylum, it is necessary to trace its origins in detail.

### 1. Pre-1968 Asylum Law

Before 1968, political asylum was governed by two statutory provisions of the Immigration and Nationality Act of 1952, Pub.L.No.82–414, 66 Stat. 163 (1952). The first, which governed deportable aliens al-

---

5. The District Court had jurisdiction to review the denial of Stevic's request for humanitarian relief by writ of habeas corpus since Stevic's deportability was not at issue therein. *Daneshvar v. Chauvin*, 644 F.2d 1248 (8th Cir. 1981); *Te Keui Liu v. INS*, 483 F.Supp. 107 (N.D.Tex. 1980); *United States ex rel. Parco v. Morris*, 426 F.Supp. 976, 978 n.4 (E.D.Pa.1977). Final orders of deportation are directly reviewable by this Court under 8 U.S.C. § 1105a. *See* note 6, *infra*.

6. Under 8 U.S.C. § 1105a, the BIA decision of September 3, 1981, denying Stevic's motion to reopen, is reviewable as a final order of deportation within the Act. *Foti v. INS*, 375 U.S. 217, 84 S.Ct. 306, 11 L.Ed.2d 281 (1963); *Giova v. Rosenberg*, 379 U.S. 18, 85 S.Ct. 156, 13 L.Ed.2d 90 (1964) (per curiam); *Wong Wing Mang v. INS*, 360 F.2d 715 (2d Cir. 1966).

ready in this country, was Section 243(h), 8 U.S.C. § 1253(h), which read:

> The Attorney General is authorized to withhold deportation of any alien ... to any country in which *in his opinion* the alien *would be subject to persecution* on account of race, religion, or political opinion ....

(Emphasis supplied).

Under that provision, an alien already in the United States and seeking political asylum to avoid deportation had to make a showing of a "clear probability of persecution" directed at the particular alien. *Cheng Kai Fu v. INS*, 386 F.2d 750 (2d Cir. 1967), *cert. denied*, 390 U.S. 1003, 88 S.Ct. 1247, 20 L.Ed.2d 104 (1968); *Lena v. INS*, 379 F.2d 536 (7th Cir. 1967). Objective proof that the applicant would be singled out for persecution by the authorities in the country to which he or she was deported was required.

The second relevant provision, which governed the admission of aliens seeking political asylum who were not in this country, was Section 203(a)(7), 8 U.S.C. § 1153(a)(7), which read:

> (a) Aliens who are subject to the numerical limitations specified in section 1151(a) of this title shall be allotted visas or their conditional entry authorized, as the case may be, as follows:
>
> > (7) Conditional entries shall next be made available by the Attorney General, ... to aliens who satisfy an Immigration and Naturalization Service officer ... (A) that (i) because of persecution or *fear of persecution* on account of race, religion, or political opinion they have fled (I) from any Communist or Communist-dominated country or area, or (II) from any country within the general area of the Middle East, and (ii) are unable or unwilling to return to such country or area on account of race, religion, or political opinion, ...

(Emphasis supplied).

Section 203(a)(7) was thus directed at aiding refugees fleeing particular regions and particular kinds of regimes. The legal standard under that section was considerably less stringent than Section 243(h)'s "clear probability" of persecution of a singled-out individual, a fact explicitly recog-

nized by the BIA in its decisions. *Matter of Tan*, 12 I. & N. Dec. 564 (1967). "[F]ear of persecution," under relevant BIA decisions, required only a showing of "good reason" for such fear. *Matter of Ugricic*, 14 I. & N.Dec. 384, 385–386 (1972). *See also Matter of Adamska*, 12 I. & N.Dec. 20 (1967).

### 2. The United National Protocol

In 1968, the United States acceded to the United Nations Protocol Relating to the Status of Refugees, 19 U.S.T. 6257, 606 U.N.T.S. 268 ("Protocol"). The Protocol adopted, with certain changes not relevant here, the definition of "refugee" used in the 1951 Convention Relating to the Status of Refugees, 189 U.N.T.S. 150 ("Convention").[7] Under the Protocol, a "refugee" is a person who,

> owing to a *well-founded fear of being persecuted* for reasons of race, religion, nationality, membership of a particular social group or political opinion, is outside the country of his nationality ....

(Emphasis supplied). No party to the Protocol may, under Article 33 of the Convention,

> return ... a refugee ... to ... territories where his life or freedom would be threatened on account of race, religion, nationality, membership of a particular social group or political opinion ....

The language of the Protocol seems considerably more generous than the "clear probability" test applied under Section 243(h). A "well-founded fear of persecution," for example, is closer to Section 203(a)(7)'s "fear of persecution" than to Section 243(h)'s admittedly restrictive standard. Moreover, the history of the Convention's definition of "refugee" demonstrates that the drafters believed a showing of "good reason" to fear persecution was sufficient to prove one's status as a "refugee." United Nations Economic and Social Council, *Report of the Ad Hoc Committee on Statelessness and Related Problems* 39 (1950) (E/1618; E/AC 32/5). That test is identical to the one used by the BIA to describe the applicable standard under former Section 203(a)(7). *Matter of Ugricic, supra.*

Interpretation of the Protocol is also informed by the United Nations High Commissioner for Refugees' *Handbook on Pro-*

---

7. The United States never acceded to the Convention.

*cedures and Criteria for Determining Refugee Status* (Geneva, 1979).[8] The *Handbook* is a response to requests for guidance as to the Protocol's requirements and is based on the High Commissioner's 25 years of experience, the practices of governments acceding to the Protocol and literature on the subject. It, too, supports the view that the Protocol embodies a more generous standard than the "clear probability" test.

Briefly summarized, it states that a "well-founded fear" has subjective as well as objective elements. *Id.* at ¶ 38. The applicant's state of mind is thus relevant, as are conditions in the country of origin, its laws, and experiences of others. *Id.* at ¶ 42–43. The applicant must show "good reason why he individually fears persecution," but a desire "to avoid a situation entailing the risk of persecution" may be enough. *Id.* at ¶ 45. Persecution means a threat to life or freedom. *Id.* at ¶ 51.

Our examination of the Protocol, its language, history and subsequent usage as derived from the *Handbook* leads us to conclude that it is somewhat more generous than the BIA's administrative practice in applying Section 243(h), which has required an applicant for asylum to show a "clear probability" that he or she will be singled out for persecution. The "clear probability" test had been initially articulated by the BIA as its preferred way of implementing what had been the wholly discretionary authority of Section 243(h). *Matter of Joseph,* 13 I. & N.Dec. 70 (1968); *see Cheng Kai Fu v. INS, supra,* 386 F.2d at 753; *Lena v. INS, supra,* 379 F.2d at 538. Since Article 33 of the Convention imposes an absolute obligation upon the United States, standards developed in an era of discretionary authority require some adjustment.

3. Asylum Law from 1968 to 1980

In the legislative proceedings leading to the United States accession to the Protocol in 1968, assurances were given by the President and the State Department that existing legislation did not need to be amended in order to comply with the Protocol. S.Exec. K, 90th Cong., 2d Sess. III, VII, VIII; S.Exec.Rep.No.14, 90th Cong., 2d Sess. 7, 10; *see also Ming v. Marks,* 367 F.Supp. 673, 677–79 (S.D.N.Y.1973), *aff'd per curiam,* 505 F.2d 1170 (2d Cir. 1974).

Nevertheless, the lack of identity between the prior practice under Section 243(h) and what should be expected after accession to the Protocol was at least suggested. The Secretary of State informed the Senate that Article 33 is "comparable" to Section 243(h) and that "it can be implemented within the administrative discretion provided by existing regulations." S.Exec. K, *supra,* at VIII. The lack of identity was also noted by the BIA, which characterized the legislative history of the accession as indicating that laws relating to deportation of refugees would remain "substantially" unaffected and that any "minor" changes could be handled "administratively." *Matter of Dunar,* 14 I. & N.Dec. 310, 316 (1973).

Despite this recognition that some administrative changes might be required by the Protocol, the BIA's decision in *Dunar* concluded that the Protocol did not modify the "clear probability" test that it had been using in Section 243(h) proceedings. The BIA's reasoning in *Dunar* began with the canon of construction disfavoring repeals by implication unless the later treaty is absolutely incompatible with the earlier statute. *Id.* at 314. It also noted the representations made by the Executive Branch to the Senate that existing immigration laws embodied the principles of the Protocol so far as refugees were concerned. *Id.* Turning to language and history, the BIA quoted from the Ad Hoc Committee's report equating a "well-founded fear" with "good reason [to] fear." *Id.* at 319. The quotation was used, however, only to refute the strawman argument that the "well-founded fear" test was exclusively subjective and to show that objective evidence was also relevant. *Id.* at 319. Ignoring that its own case law had consistently differentiated between Section 203(a)(7)'s "good reason" test and Section 243(h)'s "clear probability" requirement, the BIA leapt illogically from the proposition that "good reason" includes objective factors as well as an applicant's subjective beliefs to the conclusion that it was the same test as "clear probability." *Id.* at 319–21. The rest of the *Dunar* opinion reconciles the existence of discretion in the Attorney General under Section 243(h) with the mandatory nature of the Protocol by concluding that the Attorney General had always exercised his discretion to withhold

---

8. The BIA has treated the *Handbook* as a significant source of guidance as to the meaning of the Protocol. *Matter of Rodriguez-Palma,* Interim Decision No. 2815 (BIA, August 26, 1980).

deportation when the requisite legal standard was met. *Id.* at 321–23.

The only Court of Appeals to confront directly the issue of whether the Protocol requires a change in administrative practice under Section 243(h) was presented with the extravagant claim that the Protocol has shifted the inquiry entirely to an assessment of the applicant's subjective state of mind. *Kashani v. INS*, 547 F.2d 376, 379 (7th Cir. 1977). *Kashani* rejected this contention, reasoning that the Protocol's test of a "well-founded fear" must be "more than a matter of [the applicant's] own conjecture." *Id.* The Seventh Circuit also predicted that the "well-founded fear" standard of the Protocol and the "clear probability" standard of the BIA administering Section 243(h) "will in practice converge," *id.* Finally, the Court reconciled the discretionary power of the Attorney General with the mandatory aspect of the Protocol by relying on *Dunar's* assertion that the Attorney General always withheld deportation whenever the "clear probability" test was met. *Id.* The Fifth Circuit continued to refer to the "clear probability" test in *Pierre v. United States*, 547 F.2d 1281, 1289 (5th Cir.), *vacated and remanded to consider mootness*, 434 U.S. 962, 98 S.Ct. 498, 54 L.Ed.2d 447 (1977), but did so in the context of a parole application pursuant to 8 U.S.C. § 1182(d)(5), and with emphasis upon the discretionary nature of the Attorney General's decision, *id.* However, in *Coriolan v. INS*, 559 F.2d 993 (5th Cir. 1977), the Fifth Circuit, remanding a Section 243(h) application for reconsideration, noted that, while the Protocol did not "profoundly" alter American refugee law, United States adherence to the Protocol "reflects or even *augments* the seriousness of this country's commitment to humanitarian concerns, even in this stern field of law." *Id.* at 977 (emphasis added).

### 4. The Refugee Act of 1980

Against this backdrop, Congress enacted a comprehensive revision of asylum law in the Refugee Act of 1980. The immediate occasion for the legislation appears to have been the large numbers of "boat people" from Southeast Asia and refugees from Cuba, as well as the generalized appreciation that United States refugee policy had to be geared to handle sudden, unpredictable influxes of refugees. Congress seized this opportunity to make a comprehensive revision of immigration laws relating to asylum.

Among the revisions were amendments which did what had not been done when the United States acceded to the Protocol in 1968: the language of the immigration law was explicitly conformed to that of the Protocol, notwithstanding the earlier assurances that statutory changes were not necessary to comply with the Protocol.

Thus, whereas earlier laws contained no definition of "refugee," Section 201(a)(42) of the 1980 Act, 8 U.S.C. § 1101(a)(42) states:

> The term 'refugee' means (A) any person who is outside any country of such person's nationality . . . and who is unable or unwilling to return to . . . that country because of persecution or a *well-founded fear of persecution* on account of race, religion, nationality, membership in a particular social group, or political opinion, . . .

(Emphasis supplied). This language conforms to the definition of refugee adopted by the Protocol. *Ante* at 405.

Section 243(h) also underwent major amending in order to conform it to Article 33 of the 1951 Convention as adopted by the Protocol. It now reads:

> The Attorney General shall not deport or return any alien to a country if the Attorney General determines that such alien's life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion.

Another major change was to repeal the prior authority of Section 203(a)(7) for conditional entry of a limited number of refugees and replace it with the broader authority of newly enacted Section 207, 8 U.S.C. § 1157. Finally, Section 208(a) authorized a uniform procedure for those seeking asylum, whether physically present in the United States or at a border or point of entry. 8 U.S.C. § 1158(a). Regulations promulgated by the INS direct that asylum requests made after the institution of deportation proceedings shall "also be considered as requests for withholding . . . deportation pursuant to Section 243(h) of the Act." 8 C.F.R. § 208.3.

The significance of these changes, pertinent to this appeal, is that the adoption of a uniform definition of refugee eliminates the prior distinction between the standard for determining eligibility for a discretionary grant of asylum (formerly authorized by Section 203(a)(7) and currently authorized

by Section 207) and the standard for determining eligibility for the mandatory withholding of deportation pursuant to amended Section 243(h).

The legislative history of the Refugee Act of 1980, fairly read, recognizes that the definition of refugee is new and brings United States law into compliance with the Protocol. S.Rep.No.96–256, 96th Cong., 1st Sess. 4 (1979); H.R.Rep.No.96–608, 96th Cong., 1st Sess. 9 (1979), U.S.Code Cong. & Admin.News 1980, p. 141. The Senate Report seems to assume, however, that the amendments to Section 243(h) work no major change. S.Rep.No.96–256 at 9, 17. The House Report is more ambiguous, acknowledging that the BIA and the courts have said that the protection of Article 33 has always been available under Section 243(h) but insisting that the Article's language be explicitly used "for the sake of clarity." H.R.Rep.No.96–608 at 18. The Conference Report states that the new Section 243(h)

> is based directly upon the language of the Protocol and it is intended that the provision be construed consistent with the Protocol. The Conferees direct the Attorney General to establish a new uniform asylum procedure under the provisions of this legislation.

H.R.Conf.Rep.No.96–781, 96th Cong., 2d Sess. 20 (1980), U.S.Code Cong. & Admin. News 1980, p. 161.

5. Conclusion

Stevic's final motion to reopen under Section 243(h) was based on the Refugee Act of 1980. The BIA's denial of the motion rested on its implied view that the 1980 Act wrought no changes relevant to Stevic's application. We conclude that the Refugee Act of 1980 completed the process, begun with accession to the Protocol, of modifying the legal test applicable to Section 243(h) applications for relief from deportation. We reverse and remand for a hearing under the new standard.

█ We make no pretense of following a bright line drawn in the legislative history. Congress was rightly concerned with general issues of policy, and the INS chose not to invite it to address the interpretive problems which would inevitably arise under the new statutory language. Nevertheless, we find meaningful guideposts and read them as indicating that, at least with the passage of the 1980 Act, the "clear probability" test is no longer the applicable guide for administrative practice under Section 243(h).

The 1980 Act thoroughly undercuts the reasoning of *Dunar, supra.* Since the relevant statutory language was extensively overhauled and made to conform to the Protocol, canons of construction relating to repeals by implication are no longer of any relevance. Moreover, the Act eliminated the distinction between aliens seeking to enter as refugees under the old Section 203(a)(7) and deportable aliens already in the country seeking political asylum under the old Section 243(h). Under prior law, the former were subject to the "good reason to fear" test while the latter had to show a "clear probability" that they would be singled out for persecution. *See ante* at 405. Since the 1980 Act dictates that a uniform test of "refugee" be applied to all aliens, whether seeking admission under the newly enacted Section 207, or seeking to avoid deportation under amended Section 243(h), the legislative history indicating no major changes cannot alter the inevitable consequence that some change in administrative practice must occur. As to either applicants for asylum or applicants for withholding deportation, a change from the previous dual standard is contemplated. *See* Note, *The Right of Asylum under United States Law,* 80 Colum.L.Rev. 1125, 1138 n.87 (1980).

We believe Congress' sympathy to the plight of refugees such as the "boat people" is relevant. The general purpose of the Act is to regularize, not hinder, their entry. The Act

> reflects one of the oldest themes in America's history—welcoming homeless refugees to our shores. It gives statutory meaning to our national commitment to human rights and humanitarian concerns.

S.Rep.No.96–256 at 1, U.S.Code Cong. & Admin.News 1980, p. 141. In the context of that humane attitude, it would bring about wholly anomalous results to read the Act to impose a far more stringent legal test upon entry by refugees than had existed in prior law. Where the choice is between a concededly rigorous standard which would subject some potential asylees to the risk of persecution and a more generous one which tilts toward protection from such risk, the strongly humanitarian rhetoric accompanying the legislation is helpful to interpretation.

More important, Congress left no ambiguity about its intention to conform United States domestic law to the Protocol. That was stated explicitly on every relevant oc-

casion in the legislative history. *See, e.g., ante* at 408. The Conference Report unequivocally directed that Section 243(h) "be construed consistent with the Protocol." H.R.Cong.Rep.No.96–781 at 20, U.S.Code Cong. & Admin.News 1980, p. 161. The definition of "refugee" and the new language of Section 243(h) are based literally upon the Protocol, and the creation of a uniform legal test for refugees is derived directly from it. Finally, the discretionary language "in his opinion" has been eliminated from Section 243(h), thereby rendering the uniform standard mandatory for Section 243(h) relief. *Cf. McMullen v. INS,* 658 F.2d 1312 (9th Cir. 1981).

■ We believe, therefore, that the Refugee Act of 1980 calls upon courts, in construing the Act, to make an independent judgment as to the meaning of the Protocol. Both the text and the history of that document strongly suggest that asylum may be granted, and, under Section 243(h), deportation must be withheld, upon a showing far short of a "clear probability" that an individual will be singled out for persecution. *See ante* at 407–408. The guidance available in the High Commissioner's *Handbook,* which was published before the enactment of the Refugee Act of 1980, is to a similar effect. Since the *Handbook* was specifically designed to aid governments in interpreting the Protocol, at 2, and has been subsequently relied upon by the BIA in interpreting the revised Section 243(h), *see Matter of Rodriguez-Palma, ante* at note 8, we accord its view considerable weight.

Even when the Section 243(h) authority was discretionary, we held that the "standards employed by the Attorney General in exercising his discretion under Section 243(h) are subject to judicial review." *Sovich v. Esperdy,* 319 F.2d 21, 26 (2d Cir. 1963). After the Protocol imposed a prohibition against return of a refugee to a country where persecution would be threatened and especially after Congress amended Section 243(h) to eliminate discretion and conform the provision to the terms of the Protocol, a reviewing court has a clear responsibility to assure that the non-discretionary exercise of Section 243(h) authority has been performed according to the correct standards of law. While we do not sit to second-guess the merits of the decisions reached under Section 243(h), our obligation to assure observance of correct legal standards under this mandatory provision is to be contrasted with the more limited role of courts in reviewing BIA decisions under grants of discretionary authority, such as the "extreme hardship" provision of Section 244, 8 U.S.C. § 1254(a)(1), *INS v. Wang, supra.*

It would be unwise to attempt a more detailed elaboration of the applicable legal test under the Protocol. It emphasizes the fear of the applicant as well as the reasonableness of that fear. Its further development must await concrete factual situations as they arise. That development can be informed by the traditional indices of legislative intent, by the *Handbook* and by experience.

■ The BIA's denial of Stevic's second motion was based on a legal test which, we hold, is no longer the law. Stevic has alleged a fear of persecution based upon his anti-Communist activities in this country, the general hostility of the Yugoslav government to such activities and the particular fate of his father-in-law. His claim is not so frivolous that it should not be tested in a plenary hearing under the legal standards established by the Protocol.[9]

We reverse and remand for such a hearing.

## ON REHEARING

The INS has petitioned for rehearing, claiming, *inter alia,* that Stevic had not raised the dispositive issue before the BIA and that there was not a proper opportunity to brief that issue before us.

■ We have reviewed the briefs and the transcript of oral argument and find that prior to this petition, the INS raised no issue as to exhaustion or waiver in the proceedings before the BIA. During oral

---

**9.** To the extent that other changes in statutory language, such as the addition of the words "membership in a particular social group" to Section 243(h), might be helpful to Stevic, he is entitled to be heard on those also. In *Dunar,* the BIA itself recognized that the purpose of Section 243(h), even before its amendment in 1980, was to shield aliens from persecution because they are members of "*dissident* or unpopular minority groups." 14 I. & N.Dec. at 320 (emphasis added). And the BIA noted that the Protocol's "inclusion of the two new classes [nationality and social group] within the ambit of section 243(h) . . . is clearly compatible with the beneficent purposes underlying that provision." *Id.*

argument, counsel for the INS twice stated that if the Refugee Act of 1980 changed the legal standard, the matter ought to be remanded to the BIA for further consideration.[1] There is not even a hint of a claim that we should affirm because Stevic had failed to raise the Refugee Act issue before the BIA. We indicate no view as to what result would follow in a case in which such a claim was made.

■ So far as the opportunity to brief the question is concerned, we note that the petition concedes the issue was raised in this Court by Stevic. Moreover, the oral argument dealt almost exclusively with the effect of the Refugee Act of 1980. Had the INS felt that its briefing of the issue was inadequate, it had ample opportunity to make appropriate motions. This it declined to do. We have, nevertheless, reviewed the materials presented in the petition relevant to the merits of the decision. We find that they were fully considered in our deliberations and previous opinion, to which we adhere.

The petition for rehearing is denied.

1. JUDGE WINTER:

\* \* \* \* \* \*

The summary given us by the petitioner makes it pretty clear that the BIA decision did not recognize, did not show any explicit recognition that the standard may have changed subsequent to the January 1980 decision.

If we were to decide that the standard has changed, wouldn't we then be bound to grant some relief, at least by asking the BIA review the facts here under the new standard?

MR. PATRICK: Your Honor, if the Court were so inclined as to feel that the clear probability of persecution standard, which is used by the BIA on the third page of its decision, is the improper standard, it would seem that there certainly would have to be a reconsideration, at least of the motion to reopen, based on any new standard the Court were to feel existed.

\* \* \* \* \* \*

JUDGE WINTER: Well, the troubling part of the decision is that they . . . state expressly that he hasn't presented any new evidence that wasn't in their prior decision, when, in effect, there may not have been new evidence, but there were new problems.

MR. PATRICK: Referring to the new statute, you mean in that regard?

JUDGE WINTER: Yes.

MR. PATRICK: The decision is, of course, what is being reviewed here. It has been written and it stands. The Service feels quite secure in its interpretation of the law and I am here to represent the Service's position in that regard.

But obviously, with your Honor's hypothetical question, if the Court were to feel that the standard were improper, certainly a reconsideration under the new standard would apparently be the proper step in that regard.

Transcript of Oral Argument before this Court, January 13, 1982, pp. 29–31.