the value of the claims as did the bankruptcy court.

The Rolfite stockholders argue that in assessing the merits of its state court action for the purpose of evaluating their claims against Borne, the bankruptcy court erred both in finding the facts and in applying the law. In reviewing the record according to the standards we have just described, we cannot agree. The first such error to which they point is the bankruptcy court's conclusion that Borne had the right to unilaterally terminate its manufacturing contract upon reasonable notice. While the Rolfite stockholders may quarrel with the bankruptcy court's choice of cases to support this conclusion, the court correctly defined the applicable law. See N.J.Stat.Ann. § 12A:2–309, New Jersey Study Comment 2, and Uniform Commercial Code Comment 7. The court's finding that Borne reasonably terminated its contract with Rolfite is amply supported by the record and thus not clearly erroneous.

The Rolfite stockholders also assert that the bankruptcy court erred both in its treatment of their legal theory in the state court and in its finding that Borne did not act with malice. Whether the Rolfite action is characterized as one for malicious prosecution or as one for malicious interference with prospective business advantage, the bankruptcy court correctly found that proof of Borne's malice is an essential element. Again, the record supports the court's factual inference that such malice did not exist. While the evidence does not necessarily compel one to find that Borne had a good-faith claim to those materials which it accuses Rolfite of pirating, a reasonable factfinder has a substantial basis for such a conclusion.

Finally, the Rolfite stockholders take issue with the bankruptcy court's determination that the aborted merger with Quaker was not caused by the initiation of Borne's suit. Once again, in light of the several reasonable inferences which can be drawn from Quaker's internal memorandum, this finding is not clearly erroneous.

The court's ultimate finding of fact—that the Rolfite stockholders' claims in the reorganization proceeding were worth zero—must also be upheld since it too is not clearly erroneous. The subsidiary findings of the court plainly indicated that the Rolfite counterclaim in the state action lacked legal merit. Faced with only the remote possibility that the state court would find otherwise, the bankruptcy court correctly valued the claims at zero. On the basis of the court's subsidiary findings, such an estimation was consistent both with the claims' present value and with the court's assessment of the ultimate merits.

## IV.

The judgment appealed from will be affirmed.

**Ramin REJAIE, Petitioner,**

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

Nos. 81–2375, 82–3195.

United States Court of Appeals,
Third Circuit.

Submitted Under Third Circuit Rule 12(6)
Oct. 1, 1982.

Decided Oct. 13, 1982.

Rehearing Denied Nov. 17, 1982.

**140**

Robert S. Whitehill, Rothman, Gordon, Foreman & Groudine, P. A., Pittsburgh, Pa., for petitioner.

Thomas J. McBride, Asst. U. S. Atty., Philadelphia, Pa., Lauri Steven Filppu, Richard M. Evans, Donald B. Nicholson, Dept. of Justice, General Litigation and Legal Advice Section, Criminal Division, Washington, D. C., for respondent.

Before ALDISERT and HIGGINBOTHAM, Circuit Judges, and SAROKIN, District Judge.[*]

## OPINION OF THE COURT
ALDISERT, Circuit Judge.

This petition for review of the Board of Immigration Appeals' denial of motions to reopen deportation proceedings requires us to decide whether the Board imposed an improper burden of proof on the petitioner. The petitioner is an Iranian who came to this country in 1978 to attend school for 10 months—from September 1978 to June 1979—and now does not want to return to his native country. He contends that he will be persecuted if he returns to the Islamic Republic of Iran. In considering petitioner's request for political asylum under § 243(h) of the Immigration and Nationality Act, the Board required him to prove "a clear probability of persecution," a formulation that the Immigration and Naturalization Service equates with "a well-founded fear of persecution." We find no error and deny the petition for review at No. 81–3195.[1]

---

[*] Honorable H. Lee Sarokin, of the United States District Court for the District of New Jersey, sitting by designation.

[1] We have before us two petitions for review; however, petitioner agrees that under our decision in *Dastmalchi v. INS,* 660 F.2d 880 (3d Cir. 1981), this court is without jurisdiction to review the contention raised at No. 81–2375 that the Immigration and Naturalization Service abused its discretion when, subsequent to petitioner's deportation hearing, it denied his requests for school transfer and for extension of stay. In *Dastmalchi* we held that

courts of appeals have initial jurisdiction under section 106(a) only in cases seeking judicial review of: (1) a final order of deportation entered pursuant to section 242(b) deportation proceedings; (2) an order made during a section 242(b) deportation proceeding and reviewable by the Board of Immigration Appeals ...; or (3) a motion to reopen deporta-

## I.

Ramin Rejaie, a native and citizen of Iran, was admitted to the United States as a nonimmigrant student on September 9, 1978. He was authorized to attend Oakwood School in Poughkeepsie, New York, and to remain in the United States until June 30, 1979. According to Immigration and Naturalization Service allegations, however, he never attended Oakwood School but, without obtaining permission from the INS as required by 8 C.F.R. § 214.2(f)(4), enrolled instead at the Valley Forge Military Academy in Wayne, Pennsylvania. Moreover, he failed to depart the United States on June 30, 1979, or to obtain INS permission to stay beyond that date.

At a deportation hearing held January 8, 1980, Rejaie admitted the allegations. The immigration judge found him deportable, but granted his request for voluntary departure until February 8, 1980. Rejaie appealed to the Board of Immigration Ap-

peals, but on June 18, 1981, the Board upheld the finding of deportability.

Although ordered to report for deportation on August 27, 1981, on that date he filed a petition for review in this court, No. 81–2375, which entitled him to an automatic stay under 8 U.S.C. § 1105a(a)(3). Also on that date, he filed with the INS a Request for Asylum in the United States, contending that he feared political persecution if he were forced to return to Iran, thereby moving to reopen his case.[2] On October 16, 1981, the Board denied his motion to reopen, "on the ground that the respondent has failed to reasonably explain why he did not assert his asylum claim prior to completion of the deportation hearing." Record at 112. On December 10, 1981, he filed a second motion to reopen and reconsider, this time explaining that he had been unaware of certain political developments in Iran at the time of his deportation proceedings. Noting that Rejaie had failed to substantiate the claims made in his motions to reopen, the Board denied the second motion.[3]

---

tion proceedings previously conducted under section 242(b) or to reconsider a final order of deportation . . . .

660 F.2d at 885–86. Therefore, we dismiss the petition for review at No. 81–2375.

2. The relevant INS regulation states: "The applicant for asylum has the burden of satisfying the immigration judge that he would be subject to persecution on account of race, religion, nationality, membership in a particular social group, or political opinion as claimed." 8 C.F.R. § 108.3(a) (1981). Moreover, the INS regulation provides:

A request for asylum introduced by an alien or his representative following completion of a deportation hearing shall be considered as a motion to reopen the hearing for the purpose of submitting a request for withholding of deportation under section 243(h) of the Act . . . . Notwithstanding the provisions of §§ 103.5 and 242.22 of this chapter, a request for asylum may be considered as a motion to reopen under this paragraph and accepted for filing provided it reasonably explains the failure to assert the asylum claim prior to completion of the deportation hearing. If the motion does not reasonably explain such failure the claim for asylum will be considered spurious and dilatory, absent evidence to the contrary.

8 C.F.R. § 108.3(b) (1981).

The burden of proof relevant to requests for political asylum is set forth in 8 C.F.R. § 208.5 (1981):

The burden is on the asylum applicant to establish that he/she is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of the country of such person's nationality . . . because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

3. The Board explained:

The facts in this case have been fully set forth in our earlier decisions. Over 26 months have now passed since the respondent was granted the privilege of voluntary departure. A warrant for his deportation was issued by the District Director on August 26, 1981. Seven days later, on the very date that the respondent had been ordered to report "completely ready for deportation", he filed a petition for review. Not only does the long history of this case clearly demonstrate a series of dilatory tactics by and on behalf of the respondent, but there has been absolutely no substantiation of what counsel described as the respondent's "well-rounded [sic] fear of persecution, which has grown and developed since the completion of the deportation hearing", or of the alleged prospect of his induction into the military if deported to Iran.

In a memorandum in opposition to this motion to reopen, the Service emphasized that the "respondent has submitted no sub-

Rejaie filed a second petition for review, No. 82–3195, which we consolidated with No. 81–2375.

## II.

Rejaie contends that the Board applied an incorrect burden of proof in considering his fear of persecution in Iran. Before we reach that issue, however, we note a significant omission in Rejaie's argument. Petitioner's brief fails to respond to one of the Board's stated reasons for denying relief: his failure to submit substantial evidence to justify reopening his claim. Under 8 C.F.R. § 208.11 (1981)

> [a]n alien may request that . . . [a] deportation proceeding be reopened pursuant to . . . 8 C.F.R. § 242.22 . . . on the basis of a request for asylum. Such request must reasonably explain the failure to request asylum prior to the completion of the . . . deportation proceeding. If the alien fails to do so, the asylum claim shall be considered frivolous, absent any evidence to the contrary.

Moreover, under § 3.8(a), "[m]otions to reopen shall state the new facts to be proved at the reopened hearing and shall be supported by affidavits or other evidentiary material." The Supreme Court has observed that motions under § 3.8 "will not be granted 'when a *prima facie* case of eligibility for the relief sought has not been established.'" *INS v. Jong Ha Wang,* 450 U.S. 139, 141, 101 S.Ct. 1027, 1029, 67 L.Ed.2d 123 (1981) (per curiam) (quoting *In re Lam,* 14 I. & N. Dec. 98 (BIA 1972)).

Petitioner does not now argue that he made a sufficient showing of "new facts" supported by affidavits or other evidence. Rather, in his brief he simply summarizes

the factual content of his motion without explaining which, if any, of the narrated events, substantiated or otherwise, occurred after the deportation hearing and thus qualify as "new facts." His argument to the Board in his second motion to reopen is clearer, however, and indicates that petitioner's "new facts" related to the war between Iran and Iraq, and his unwillingness to serve in the Iranian military. Assuming that the motion before the Board constitutes the basis of petitioner's argument on appeal, we will consider the burden of proof issue.[4]

## III.

Until the passage of Refugee Act of 1980, it was generally accepted that under § 243(h) of the Immigration and Nationality Act, 8 U.S.C. § 1253(h), the INS could withhold political asylum absent a "clear probability" that an alien would suffer persecution if deported. *See, e.g., Cheng Kai Fu v. INS,* 386 F.2d 750, 753 (2d Cir. 1967), *cert. denied,* 390 U.S. 1003, 88 S.Ct. 1247, 20 L.Ed.2d 104 (1968); *Lena v. INS,* 379 F.2d 536, 538 (7th Cir. 1967). In 1968, the United States acceded to the United Nations Protocol Relating to the Status of Refugees, 19 U.S.T. 6257, 606 U.N.T.S. 268, which essentially adopted the definition of "refugee" used in the 1951 Convention Relating to the Status of Refugees, 189 U.N.T.S. 150. Under Article 1 of the Protocol, a "refugee" is a person who, "owing to *a well-founded fear of being persecuted* for reasons of race, religion, nationality, membership of a particular social group or political opinion, is outside the country of his nationality . . . ." (emphasis added). Under Article 33, no party to the Protocol may "return . . . a

---

stantial evidence which would justify reopening." The Service concluded that "The motion to reopen is an obvious attempt to delay the deportation of the respondent, which should not be permitted . . . . To again reopen at this time would be frivolous and would serve no useful purpose." We agree. As this Board has long since held, "There must be some finality to litigation." *See Matter of Campos,* 13 I&N Dec. 148 (BIA 1969). Accordingly, the motion to reopen will be denied.

Record at 85.

4. Although the Board in its several opinions did not expressly label the applicable burden of proof, we will assume that it agreed with the government's Memorandum in Opposition to Motion to Reopen, in which the legal standard was identified as "clear probability," Record at 91–92, inasmuch as that standard had been approved in a long line of cases, see discussion, *infra.*

refugee ... to ... territories where his life or freedom would be threatened on account of race, religion, nationality, membership of a particular social group or political opinion ...." Whether accession to the Protocol affected burden of proof of persecution was addressed in *Kashani v. INS,* 547 F.2d 376 (7th Cir. 1977), in which the court determined that there was no substantial difference between "clear probability" and "a well-founded fear":

> While the Protocol, unlike section 243(h) of the Immigration and Nationality Act, does not specifically grant discretion to the Government in determining whether deportation must be withheld, it only requires withholding when an alien has a "well founded fear of being persecuted." This language surely refers to more than the alien's subjective state of mind. We hold that an alien claiming a "well founded fear of persecution" must either demonstrate that he actually has been a victim of persecution or that his fear is more than a matter of his own conjecture. Our interpretation of "well founded" conforms with the understanding of the committee that drafted the definition of a refugee. *See* United Nations Economic and Social Council, *Report of the Ad Hoc Committee on Statelessness and Related Problems* 39 (February 17, 1950) (E/1618; E/AC 32/5).

5. In *Dunar* the Board observed:
   In his statement to the Senate Committee on Foreign Relations, the State Department's representative, Laurence A. Dawson [Acting Deputy Director of the Office of Refugee and Migration Affairs] asserted:
   ... [W]hile the concept of guaranteeing safe and humane asylum is the most important element of the Protocol, accession does not in any sense commit the contracting state to enlarge its immigration measures for refugees. Rather, the asylum concept is set forth in the prohibition against the return of a refugee in any manner whatsoever to a country where his life or freedom would be threatened; and the prohibition under Article 32 against the deportation of a refugee lawfully in the territory of a contracting state to any country except in cases involving national security or public order. The deportation provisions of the Immigration and Nationality Act, with limited exceptions, are consistent, with this concept. The Attorney General

This requirement can only be satisfied by objective evidence that the alien's assertions are correct. Thus, the "well founded fear" standard contained in the Protocol and the "clear probability" standard which this court has engrafted onto section 243(h) will in practice converge. 547 F.2d at 379.

This formulation is congruent with the Board's seminal decision in *In re Dunar,* 14 I. & N. Dec. 310 (BIA 1973), in which the Board considered whether the Senate's accession to the Protocol changed an alien's burden under § 243(h) from that of showing a "clear probability of persecution" to that of showing "a well-founded fear of being persecuted." Like the court in *Kashani,* the Board concluded that notwithstanding the difference in the terminology, the showings required by the Protocol and by § 243(h) were essentially the same. The Board characterized the showing of "well-founded fear" as demanding not merely evidence of a subjective or conjectural fear of persecution, but objective evidence establishing a realistic likelihood of persecution. 14 I. & N. Dec. at 319.

The Board's conclusion in *Dunar* is based on the history of the Senate's accession to the Protocol. The Senate clearly acceded to the Protocol with the understanding that the substance and procedures of our immigration law would remain unchanged.[5]

will be able to administer such provisions in conformity with the Protocol without amendment of the Act.
14 I. & N. Dec. at 317 (quoting Protocol Relating to Refugees, Exec. Rep. No. 14, 90th Cong., 2d Sess. app. at 8 (1968) [hereinafter cited as Report] ).
The following colloquy between Senator Sparkman, Chairman of the Committee, and Mr. Dawson is also helpful:
SENATOR SPARKMAN. I want to make certain of this: Is it absolutely clear that nothing in this protocol, first, requires the United States to admit new categories or numbers of aliens?
MR. DAWSON. That is absolutely clear.
Report at 19.
Senator Mansfield, at the time of the Protocol's submission to the Senate stated: "It is understood that the Protocol would not impinge adversely upon the Federal and State laws of this country." 114 Cong.Rec. 12,021 (daily ed. Oct. 3, 1968).

Moreover, as noted in *Dunar,* a United Nations committee had explained "well-founded fear" as follows: "The expression 'well-founded fear of being the victim of persecution for reasons of race, religion, nationality or political opinion' means that a person has either been actually a victim of persecution or can show good reason why he fears persecution." United Nations Economic and Social Council, Report of the Ad Hoc Committee on Statelessness and Related Problems 39 (1950). In the years following the decision in *Dunar,* the expressions "clear probability" and "well-founded fear" were regarded as meaning the same thing: an alien who requested political asylum in America had to present some objective evidence establishing a realistic likelihood that he would be persecuted in his native land. *See, e.g., Fleurinor v. INS,* 585 F.2d 129, 132, 134 (5th Cir. 1978); *Martineau v. INS,* 556 F.2d 306 (7th Cir. 1977) (per curiam); *Pereira-Diaz v. INS,* 551 F.2d 1149, 1154 (9th Cir. 1977); *Zamora v. INS,* 534 F.2d 1055, 1058, 1063 (2d Cir. 1976). Nevertheless, relying on *Stevic v. Sava,* 678 F.2d 401 (2d Cir. 1982), petitioner contends that this consensus was upset by the passage of the Refugee Act of 1980. We now examine that legislation to determine whether it produced a significant change.

### IV.

The Refugee Act adds to the Immigration Act a new definition of "refugee" as, *inter alia,* any person who has a "well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). The legislative history shows that the House and Senate added that definition to conform the language of the Immigration and Nationality Act to the language of the Protocol.

> The Committee Amendment provides a new definition of the term "refugee" which will be added to the Immigration and Nationality Act. The first part of the definition essentially conforms to that used under the United Nations Convention and Protocol Relating to the Status of Refugees.

H.R.Rep.No.608, 96th Cong., 1st Sess. 9 (1979).

> The bill provides a new statutory definition of a refugee which will be added to the Immigration and Nationality Act.... [T]he new definition will bring United States law into conformity with our international treaty obligations under the United Nations Protocol Relating to the Status of Refugees ....

S.Rep.No.256, 96th Cong., 1st Sess. 4, *reprinted in* 1980 U.S.Code Cong. & Ad.News 141, 144.

The Refugee Act also modifies § 243(h) so that an alien is eligible for withholding of deportation if he can show that his "life or freedom would be threatened ... on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1253(h)(1) (Supp. IV 1980).[6]

Like the adoption of the new definition of "refugee," the modification of § 243(h) was effected solely for the sake of clarity so that its language would conform more closely with the language of the Protocol. In modifying § 243(h), the House clearly understood that the standards under § 243(h) and under the Protocol were the same.

> The Attorney General shall not deport or return any alien ... to a country if the Attorney General determines that such alien's life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion.
>
> 8 U.S.C. § 1253(h)(1) (Supp. IV 1980).

---

**6.** The prior version of § 243(h) provided:

> The Attorney General is authorized to withhold deportation of any alien within the United States to any country in which in his opinion the alien would be subject to persecution on account of race, religion, or political opinion and for such period of time as he deems to be necessary for such reason.

8 U.S.C. § 1253(h) (1976) (amended 1980).

As amended by the Refugee Act of 1980, the section states in relevant part:

Related to Article 33 [the portion of the Protocol that prohibits the expulsion of a "refugee"] is the implementation of section 243(h) of the Immigration and Nationality Act. That section currently authorizes the Attorney General to withhold the deportation of any alien in the United States to any country where, in his opinion, the alien would be subject to persecution on account of race, religion, or political opinion.

*Although this section has been held by court and administrative decisions to accord to aliens the protection required under Article 33, the committee feels it desirable, for the sake of clarity, to conform the language of that section to the Convention.* This legislation does so by prohibiting, with certain exceptions, the deportation of an alien to any country if the Attorney General determines that the alien's life or freedom would be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion.

H.R.Rep.No.608, 96th Cong., 1st Sess. 18 (1979) (emphasis added).

■ The government on this appeal advises us that the Board, in determining eligibility for withholding of deportation, has continued to use the same analysis that it used prior to the passage of the Refugee Act, and that the Board continues to view as interchangeable the terms "clear probability" and "well-founded fear" to describe that analysis. *See In re Martinez-Romero,* Interim Dec. No. 2872 (BIA 1981); *In re Lam,* Interim Dec. No. 2857 (BIA 1981). Under this analysis the Board takes into consideration an alien's apprehensions of persecution, but also requires him to produce objective evidence which demonstrates the realistic likelihood that he, or a class to which he belongs, will be persecuted. Generalized, undocumented fears of persecution or political upheaval which affect a country's general populace are insufficient bases for withholding deportation under § 243(h). *In re Martinez-Romero,* Interim Dec. No. 2872 (BIA 1981).

Notwithstanding the foregoing, the Second Circuit in *Stevic v. Sava,* 678 F.2d 401 (2d Cir. 1982), concluded that the Refugee Act has in fact produced a change in the burden of proof. Because petitioner's argument depends on that case, we now turn to analysis of the Second Circuit's reasoning.

## V.

Acknowledging that "the matter is hardly free from doubt," *id.* at 404, the *Stevic* court charted the evolution of the phrases in issue. It noted that prior to the 1968 accession to the United Nations Protocol, the INS had employed the "clear probability" standard in regard to deportable aliens under § 243(h), but, under § 203(a)(7) (repealed 1980), had applied a less stringent standard, "good reason to fear," when considering admission of aliens not already in this country. *In re Tan,* 12 I. & N. Dec. 564 (BIA 1967). The Protocol's definition of "refugee"—a person having a "well-founded fear of being persecuted"—was, in the *Stevic* court's view, "considerably more generous than the 'clear probability' test," 678 F.2d at 405, and more closely resembled the standard used under § 203(a)(7). Turning its attention to developments between 1968 to 1980, the court focused on "suggestions" that modification of practice under § 243(h) might be required by the Protocol: a statement in *Dunar* that procedures would be "substantially" unaffected and that minor changes could be handled administratively; and the statement of the Secretary of State that Article 33 was "comparable" to § 243(h). The court in *Stevic* faulted the Board's *Dunar* opinion:

> Ignoring that its own case law had consistently differentiated between Section 203(a)(7)'s "good reason" test and Section 243(h)'s "clear probability" requirement, the BIA leapt illogically from the proposition that "good reason" includes objective factors as well as an applicant's subjective beliefs to the conclusion that it was the same test as "clear probability."

678 F.2d at 407. Acknowledging that *Kashani* had equated the two tests, the *Stevic*

court noted that the Fifth Circuit in *Coriolan v. INS,* 559 F.2d 993 (5th Cir. 1977), had stated that the Protocol, while not profoundly altering the law, " 'reflects or even *augments* the seriousness of this country's commitment to humanitarian concerns, even in this stern field of law.' " 678 F.2d at 407 (quoting 559 F.2d at 997).

Finally, the court gauged the effect of the Refugee Act of 1980. It observed that the addition of the definition of "refugee," the modification of § 243(h), and other changes tending to eliminate disparity in procedures were effected at a time when Congress was acutely aware of the plight of "boat people." The court concluded that the adoption of the Protocol's definition of "refugee" eliminated the distinction between the standards that had been applied in §§ 243(h) and 203(a)(7), and that if only one standard could be used, Congress would seek to employ the more humanitarian standard.

Upon examining the opinion in *Stevic,* we conclude that the court erred. First, it attributed a stringency to the phrase "clear probability" that was not consistent with its own observation in *Cheng Kai Fu v. INS,* 386 F.2d 750, 753 (2d Cir. 1967), that, under the "clear probability" standard, "[i]n order to forestall deportation the aliens must show some evidence indicating they would be subject to persecution," a formulation that closely approximates the *Dunar* definition of "well founded fear" as "realistic likelihood of persecution." 14 I. & N. Dec. at 319. Second, the court failed to appreciate the caselaw consensus, discussed *supra,* that the two standards were equivalent. Third, the court apparently misapprehended the legislative history of the 1968 accession to the Protocol and of the Refugee Act. As we have noted above and as the *Stevic* court itself acknowledged, Congress was repeatedly assured that accession to the Protocol would not enlarge or alter the effect of existing immigration laws. The Refugee Act's adoption of the Protocol's definition of "refugee" and the modification of § 243(h), as we have seen, were made solely for the sake of clarity. Conceding that the Senate report stated that the amendment to

§ 243(h) worked "no major change," the *Stevic* court described the House report as "ambiguous." We perceive no ambiguity in the House Committee's statement:

Although [Section 243(h)] has been held by court and administrative decisions to accord to aliens the protection required under Article 33 [of the Protocol], the Committee feels it desirable, for the sake of clarity, to conform the language of that section to the Convention.

H.R.Rep.No.608, 96th Cong., 1st Sess. 18 (1979). The legislative history points in one direction only: the modification of § 243(h) was effected merely to conform the language to that of the Convention and Protocol. This was merely cosmetic surgery, for in operation INS procedures under the old § 243(h) had been held to conform.

■ In our view, the *Kashani* conclusion that there is no difference in the Board's burden of proof formulation whether labeled "clear probability" or "well-founded fear" of persecution survives the Refugee Act of 1980. We reject a view that would "make a fortress out of a dictionary," *Cabell v. Markham,* 148 F.2d 737, 739 (2d Cir.) (L. Hand, J.), *aff'd,* 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945). A word or a phrase "is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used." *Towne v. Eisner,* 245 U.S. 418, 425, 38 S.Ct. 158, 159, 62 L.Ed. 372 (1918) (Holmes, J.). We read "well-founded fear" within the circumstances of its use and hold that it equates with "clear probability."

### VI.

■ Applying these legal precepts to the facts brought before us by this petition for review, we hold that the Board did not err in denying the motions to reopen. Petitioner presented to the Board only his conjecture that he would be faced with induction into the military if he was returned to Iran, and that, because war was repugnant to his personal beliefs, he would refuse induction

and therefore suffer persecution. None of these allegations was supported by affidavit or any other form of proof. Therefore, we must conclude that petitioner did not demonstrate by objective evidence a realistic likelihood that he would be persecuted in his native land. The "probability of persecution" is not "clear"; the "fear of persecution" is not "well-founded."

## VII.

The petition for review at 81–2375 will be dismissed for lack of jurisdiction. The petition for review at 82–3195 will be denied.