**Espectacion
BOLANOS–HERNANDEZ, Petitioner,**

**v.**

**IMMIGRATION & NATURALIZATION
SERVICE, Respondent.**

No. 83–7608.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 5, 1984.

Decided Dec. 19, 1984.·

As Amended March 1, 1985.

**1318**

Eliseo Z. Sisneros, California Rural Legal Assistance Foundation, Berkeley Law Foundation, El Centro, Cal., Paula D. Pearlman, Imperial Valley Immigration Project, Centro Asuntos Migratorios, El Centro, Cal., for Espectacion Bolanos.

Madelyn E. Johnson, Dept. of Justice, Washington, D.C., for respondent.

Before ELY,\* FLETCHER, and REINHARDT, Circuit Judges.

REINHARDT, Circuit Judge:

Espectacion Bolanos-Hernandez petitions for review of the Immigration and Naturalization Service's denial of his application for "withholding of deportation" and political asylum. We find that the decision of the Board of Immigration Appeals is not supported by substantial evidence. Bolanos meets both the clear probability and well-founded fear of persecution standards.

---

\* Judge Ely participated in the oral argument and the post-argument conference and joined in the decision to reverse on the grounds stated in this Opinion. He died, however, before the Opinion was prepared.

He therefore may not be deported and is eligible for asylum.

## I. BACKGROUND

Bolanos, a native and citizen of El Salvador, entered the United States in September 1982 without inspection by an immigration officer. During his deportation hearings, which commenced the following month, he conceded deportability on the basis of his illegal entry but filed an application for asylum and for a determination that he was not deportable because he would be subject to political persecution.

Bolanos testified that for two years he had been a member of the Partido National de Reconciliation, a right-wing party in El Salvador. He had also been in the army and had been a member of Escolta Militia, a voluntary civilian police squad that guards against guerrilla infiltration for the government. According to Bolanos, the guerrillas believe that, because of his membership in these groups, he would be particularly useful to them in their plans to infiltrate the government. When he refused to join the guerrillas, they threatened him, telling him they would kill him if he did not join their forces or, alternatively, leave the country. Bolanos took this threat seriously because the guerillas had killed five of his friends and had used similar tactics to recruit his brother—whom he believes they may have subsequently killed.[1] Bolanos left El Salvador eight days after the guerillas made their threat.

In addition to his own specific, individualized basis for fearing persecution, Bolanos testified about the great danger that male youths in general face in El Salvador. He also introduced newspaper articles attesting to the general conditions of violence, armed conflict, and guerrilla control in large portions of that country.

---

1. Bolanos also fears persecution by the Salvadoran government because of his brother's association with the guerrillas. We need not and do not reach the question whether Bolanos has demonstrated either a well-founded fear or a clear probability of persecution by the government.

The government concedes that Bolanos has indicated his commitment not to be affiliated with either side in the political struggle—"his desire to remain neutral and not be affiliated with any political group." The Immigration Judge, however, determined that Bolanos had not shown that any danger he might be subject to would be because of his political opinion, and both the Immigration Judge and the Board of Immigration Appeals determined that Bolanos failed to show that he had a specific reason to fear persecution that distinguished his situation from that of other Salvadorans. We disagree.

## II. STATUTORY FRAMEWORK

The Refugee Act of 1980, Pub.L. No. 96–212, 94 Stat. 102 (codified in scattered sections of 8 U.S.C. (1982)), amended the Immigration and Nationality Act so as to bring United States statutory provisions into conformity with the analogous provisions of the United Nations Convention Relating to the Status of Refugees.[2] In passing the Refugee Act, Congress was motivated by the enduring "historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands," and sought to provide "statutory meaning to our national commitment to human rights and humanitarian concerns."[3]

There are two code sections that come into play when an alien petitions for relief from deportation because of a threat of political persecution. Section 208(a) of the Refugee Act of 1980, 8 U.S.C. § 1158(a) (1982), provides for asylum for political refugees, while section 243(h) of the Immigration and Nationality Act, as amended by section 203(e) of the Refugee Act, 8 U.S.C. § 1253(h), prohibits the Attorney General from deporting an alien whose life or freedom would be threatened. When an alien fears political persecution and seeks, on that ground, to block deportation proceedings, the INS provides him with a form entitled "Request for Asylum in the United States." Requests for asylum under section 208(a), when made after the initiation of deportation proceedings, are "also ... considered as requests ... [under] section 243(h)." 8 C.F.R. § 208.3(b) (1983).[4] The Immigration Judge and the Board of Immigration Appeals are required to evaluate such requests under both (i) the criteria for determining whether, under section 243(h), the Attorney General is prohibited from deporting the alien, and (ii) the criteria for determining whether the alien meets the eligibility requirements for asylum under section 208(a). *See INS v. Stevic,* —— U.S. ——, 104 S.Ct. 2489, 2497 & n. 18, 81 L.Ed.2d 321 (1984).

The amended version of section 243(h) provides in relevant part:

(h)(1) The Attorney General shall not deport or return any alien ... to a country if the Attorney General determines that such alien's life or freedom would be threatened in such country on account of race, religion, nationality, membership in

2. *See* S.Rep. No. 256, 96th Cong., 2d Sess. 4, *reprinted in* 1980 U.S.Code Cong. & Ad.News 141, 144; H.R.Conf.Rep. No. 781, 96th Cong., 2d Sess. 19, 20, *reprinted in* 1980 U.S.Code Cong. & Ad.News 160, 161. The United States agreed to comply with these provisions of the United Nations Convention Relating to the Status of Refugees, *done* July 28, 1951, 189 U.N.T.S. 150, when it acceded in 1968 to the United Nations Protocol Relating to the Status of Refugees, *done* January 31, 1967, 19 U.S.T. 6224, T.I.A.S. No. 6577, 606 U.N.T.S. 268.

3. The first quotation is from the Refugee Act of 1980, § 101, Pub.L. No. 96–212, 94 Stat. 101, 102 (codified as *Congressional Declaration of Policies and Objectives,* at 8 U.S.C. § 1521 note (1982)). The second quotation is from the legis-

lative history of the Act. S.Rep. No. 256, 96th Cong., 2d Sess. 1, *reprinted in* 1980 U.S.Code Cong. & Ad.News 141, 141.

4. There are two ways that an alien claiming asylum under § 208 can have that claim reviewed by the INS. Before formal deportation proceedings have begun, the alien may submit an application for asylum to the local INS district director. 8 C.F.R. § 208.3(a)(2) (1983). Once deportation proceedings have begun, the alien can file an application for asylum with the docket clerk of the immigration court. *Id.* at § 208.3(b). The Immigration Judge who determines deportability considers claims filed after the initiation of deportation proceedings. *Id.* at § 242.8.

a particular social group, or political opinion.

The Supreme Court has recently held that, although the Refugee Act amended the language of section 243(h) of the Immigration and Nationality Act, the change in language did not liberalize the standard of proof an applicant must satisfy. *INS v. Stevic,* — U.S. —, 104 S.Ct. 2489, 2496, 81 L.Ed.2d 321 (1984). The alien still must show a clear probability of persecution; otherwise he cannot invoke the section 243(h) bar to deportation. The term "a clear probability" means "a likelihood": "The question under [the section 243(h)] standard is whether it is more likely than not that the alien would be subject to persecution." *Id.* 104 S.Ct. at 2498 (footnote omitted).[5]

■ Although the standard of proof under section 243(h) remained unchanged, Congress did significantly curtail the Attorney General's discretionary authority over deportations when it passed the Refugee Act. Previously, even when an alien showed a clear probability of persecution, the Attorney General had the discretion to order or withhold deportation.[6] Now, the amended section prohibits the Attorney General from deporting aliens who make that showing. *See Stevic,* 104 S.Ct. at 2496 n. 15; *Chavez v. INS,* 723 F.2d 1431, 1432

(9th Cir.1984); *McMullen v. INS,* 658 F.2d 1312, 1316 (9th Cir.1981).[7] Thus, the term used to describe the discretionary form of relief available under the former version of the statute—"withholding of deportation" —does not fit the operational scheme now set forth in the statute. The form of relief mandated by the amended section 243(h) is better described as a prohibition against deportation.[8]

Despite the 1980 amendments, the Attorney General retained his discretionary authority to grant asylum to aliens under some circumstances. An alien who does not meet the clear-probability standard applicable under section 243(h), but who has a well-founded fear of persecution, is eligible for a discretionary grant of asylum. Such a person qualifies as a "refugee" as that term is defined in section 101(a) of the Refugee Act:

> [A]ny person who is outside any country of such person's nationality ... and who is unable or unwilling to return to ... that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion....

8 U.S.C. § 1101(a)(42)(A) (1982); *see also* 8 C.F.R. § 208.5 (1983). As the Supreme

---

5. The Supreme Court has consistently maintained that, "in deportation proceedings ... the Government [must] establish the facts supporting deportability by clear, unequivocal, and convincing evidence." *Woodby v. INS,* 385 U.S. 276, 87 S.Ct. 483, 17 L.Ed.2d 362 (1966); *accord Stevic,* 104 S.Ct. at 2498 n. 19. The alien, in contrast, bears a lesser burden of proof in establishing non-deportability under § 243(h). The "likelihood" standard which the alien must meet is less stringent than the "clear and convincing evidence" standard which the government must meet in order to establish that the alien is not legally present in the United States. *Id.*

6. The language of the original § 243(h) can be found in the Immigration and Nationality Act, Pub.L. No. 82–414, 66 Stat. 212, 214 (1952) (codified as amended at 8 U.S.C. § 1253(h) (1982)).

7. The United Nations Protocol similarly dictates that no party to the Protocol shall "expel or return ... a refugee ... to ... territories where his life or freedom would be threatened on

account of his race, religion, nationality, membership of a particular social group or political opinion." United Nations Convention Relating to the Status of Refugees art. 33, 189 U.N.T.S. at 176 (incorporated by reference at United Nations Protocol Relating to the Status of Refugees art. I, ¶ 1, 19 U.S.T. at 6225).

8. Because the form of relief available under section 243(h) is no longer discretionary, the limited abuse of discretion standard of review that we applied to decisions under the former section, *see, e.g., Pereira-Diaz v. INS,* 551 F.2d 1149, 1154 (9th Cir.1977); *Kasravi v. INS,* 400 F.2d 675, 677 & n. 3 (9th Cir.1968), is no longer applicable. The mandatory language of the amended section requires us to review the BIA's denial of an application for a prohibition against deportation under a heightened, substantial evidence standard of review. *See Zepeda-Melendez v. INS,* 741 F.2d 285 at 289 (9th Cir.1984); *Zavala-Bonilla v. INS,* 730 F.2d 562, 564 & n. 2 (9th Cir.1984); *McMullen v. INS,* 658 F.2d 1312, 1316 (9th Cir.1981).

Court made clear in *Stevic*, 104 S.Ct. at 2497 n. 18, the determination of refugee status under section 101 is based upon factual findings. Once an alien qualifies as a refugee, the Attorney General has discretion to grant asylum under section 208(a) of the Refugee Act of 1980, 8 U.S.C. § 1158(a) (1982). *See also* 8 C.F.R. § 208.8 (1983) (factors governing discretion).[9]

▉▉▉ Although declining to decide the meaning of the phrase "well-founded fear of persecution," *see Stevic*, 104 S.Ct. at 2501, the Supreme Court was willing to assume for purposes of that case that the standard is "more generous than the clear-probability-of-persecution standard." *Stevic*, 104 S.Ct. at 2498.[10] We believe the assumption was correct and that the well-founded-fear standard is in fact "more generous" than the clear-probability test. The difference in language between section 243(h) and section 208(a) strongly supports the conclusion that the standard under the latter is more liberal.[11] Section 243(h) is phrased in objective terms: "such alien's life or freedom *would* be threatened." (Emphasis added.) Section 208(a), in contrast, allows for a partially subjective showing: "a well-founded fear of persecution."[12] Moreover, both sections are appli-

9. Accordingly, we apply a two-tiered standard of review to § 208(a) decisions. *See Carvajal-Munoz v. I.N.S.*, 743 F.2d 562, 567–68 (7th Cir.1984). As we do when reviewing other non-discretionary agency determinations, *see Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 414, 91 S.Ct. 814, 822, 28 L.Ed.2d 136 (1971); *Kasravi v. INS*, 400 F.2d 675, 677 (9th Cir.1968), we apply a substantial evidence test when reviewing the factual finding whether an alien has demonstrated a well-founded fear of persecution. When refugee status has been established, we review the Attorney General's grant or denial of asylum under the abuse of discretion standard that we apply to other discretionary actions of the BIA. *See INS v. Jong Ha Wang*, 450 U.S. 139, 144–45, 101 S.Ct. 1027, 1031–32, 67 L.Ed.2d 123 (1981).

10. Prior to the Supreme Court's *Stevic* decision, courts frequently assumed that the criteria for eligibility for a grant of asylum under § 208(a) were identical to those for a prohibition of deportation under § 243(h). *See, e.g., Zavala-Bonilla v. INS*, 730 F.2d 562, 563 n. 1 (9th Cir.1984) (declining to decide whether standard is "clear probability" or "well-founded fear of persecution," but treating a request for political asylum filed during deportation proceedings as identical to an application for withholding of deportation); *Minwalla v. INS*, 706 F.2d 831, 835 (8th Cir.1983) (declining to choose standard but treating section 243(h) claim as alien's only available asylum claim); *Reyes v. INS*, 693 F.2d 597, 599–600 (6th Cir.1982) (a showing short of a clear probability is sufficient for both); *Rejaie v. INS*, 691 F.2d 139, 146 (3d Cir.1982) (requiring evidence of a clear probability of persecution in order to demonstrate that a fear of persecution is well-founded); *Stevic v. Sava*, 678 F.2d 401, 407–08 (2d Cir.1982) (well-founded fear necessary both for eligibility for discretionary grant of asylum and for mandatory withholding of deportation), *rev'd*, — U.S. ——, 104 S.Ct. 2489, 81 L.Ed.2d 321 (1984). The Board of Immigration Appeals did not alter its requirements for granting asylum to undocumented aliens after the Refugee Act was passed, *see Rejaie*, 691 F.2d at 145, and, in the instant case, as in others, *see, e.g., id.*, the Board has treated the two standards as identical. *See* Helton, *Political Asylum Under the 1980 Refugee Act: An Unfulfilled Promise*, 17 J.L. Reform 243, 252 (1984) (INS continues to adhere to "clear probability" standard).

11. Although we have previously held that "mere assertions of possible fear" are insufficient, *see Shoaee v. INS*, 704 F.2d 1079, 1084 (9th Cir. 1983), none of our past cases has required us to define precisely the term "well-founded fear." *See Zavala-Bonilla v. INS*, 730 F.2d 562, 564 n. 1 (9th Cir.1984); *Chavez v. INS*, 723 F.2d 1431, 1433 (9th Cir.1984). We believe that an evaluation of whether an alien has a well-founded fear includes consideration of the applicant's state of mind, *see Stevic v. Sava*, 678 F.2d 401, 406 (2d Cir.1982), *rev'd on other grounds*, 104 S.Ct. 2489, 81 L.Ed.2d 321 (1984); *Developments in the Law—Immigration Policy and the Rights of Aliens*, 96 Harv.L.Rev. 1286, 1355 (1983), as well as an evaluation of "conditions in the country of origin, its laws, and the experiences of others." *Stevic v. Sava*, 678 F.2d 401, 406 (2d Cir.1982), *rev'd on other grounds*, — U.S. ——, 104 S.Ct. 2489, 81 L.Ed.2d 321 (1984); *Developments, supra*. "[A] desire 'to avoid a situation entailing the risk of persecution' may be enough" to satisfy the well-founded-fear test. *Stevic*, 678 F.2d at 406 (citing United Nations High Commissioner for Refugees, *Handbook on Procedures and Criteria for Determining Refugee Status* (1979)); *accord Reyes v. INS*, 693 F.2d 597, 599–600 (6th Cir.1982); *see also Zavala-Bonilla v. INS*, 730 F.2d 562, 564 n. 1 (9th Cir.1984) (approving Second Circuit's reasoning in *Stevic* with respect to meaning of "well-founded fear"). *But see Rejaie v. INS*, 691 F.2d 139, 146 (3d Cir.1982); *Kashani v. INS*, 547 F.2d 376, 379 (7th Cir.1977).

12. As under the clear-probability standard, general documentary evidence about oppressive conditions is relevant to support more specific

cable to aliens present in the United States. *See Stevic,* 104 S.Ct. 2497 & n. 18. It is apparent that Congress provided for the possibility of mandatory relief under section 243(h) and discretionary relief under section 208(a) for the same persons. It seems reasonable to conclude that Congress did so because an alien entitled to relief under section 243(h) will have established the clear probability that his or her life or freedom is actually threatened, while an alien who qualifies under section 208(a) may have only established the existence of a valid reason for fear.[13]

Rather than evaluating Bolanos' section 208(a) and section 243(h) claims separately, the Immigration Judge and Board of Immigration Appeals considered and rejected both together, concluding that Bolanos failed to demonstrate a well-founded fear or clear probability of political persecution. When the Board has disposed of the two claims in this combined fashion, we believe the proper approach for the reviewing court is first to consider the section 243(h) claim under the more stringent clear-probability standard. Then, if it concludes that the alien's 243(h) petition was properly denied, it should review the 208(a) claim under the more generous well-founded-fear standard. However, if the court concludes that the alien met the clear-probability standard, it need go no farther since the well-founded fear standard will, *a fortiori,* also have been met.

## III. PROHIBITION AGAINST DEPORTATION UNDER SECTION 243(h)

■ Bolanos contends that the Attorney General cannot deport him because his "life or freedom would be threatened ... on account of ... political opinion." 8 U.S.C. § 1253(h) (1982).[14] In order to invoke this section of the Immigration and Nationality Act, Bolanos must show the following:

1. A likelihood of persecution; i.e., a threat to life or freedom.

2. Persecution by the government or by a group which the government is unable to control.

3. Persecution resulting from the petitioner's political beliefs.

4. The petitioner is not a danger or a security risk to the United States.

*Zepeda-Melendez v. INS,* 741 F.2d 285, 289 (9th Cir.1984); *McMullen,* 658 F.2d at 1315. Neither side questions that Bolanos has met the second criteria (assuming the first has been met) and the fourth. The government does not contend that the Salvadoran government is both willing and able to control the guerrillas' campaign of terror and to protect the safety and human rights of residents of El Salvador. Nor is there any suggestion that Bolanos is a threat to the United States. Rather, the government argues that Bolanos has not demonstrated a likelihood that his life or freedom are endangered; it also argues that he has not shown that any persecution he might suffer would result from his political beliefs. We disagree.

### A. *Likelihood of Persecution*

The case before us raises questions relating to the significance to be afforded specific threats of physical retribution, the purposes for which documentary evidence may be used, and the relevance of the existence of a general level of violence in a particular country. We have previously given some indications of the showing necessary to establish a clear probability of persecution. We have said that some "factual support," *Khalil v. District Director of the INS,* 457 F.2d 1276, 1278 (9th Cir. 1972), some "concrete evidence," *Shoaee v. INS,* 704 F.2d 1079, 1084 (9th Cir.1983), or

---

evidence of the alien's well-founded fear of persecution. *Zavala-Bonilla,* 730 F.2d at 564.

**13.** Furthermore, the term "persecution" in § 101 may not be limited to "a threat to life or freedom," as is required under section 243(h). *See Stevic,* 104 S.Ct. at 1500 n. 22; *Kovac v. INS,* 407 F.2d 102, 107 (9th Cir.1969) ("persecution" is infliction of suffering or harm upon those who differ in a way regarded as offensive, and includes more than just physical persecution).

**14.** Bolanos did not argue that he would be persecuted on the basis of race, religion, nationality, or membership in a particular social group— the other forms of persecution that would prohibit the Attorney General from deporting him. *See* 8 U.S.C. § 1253(h) (1982).

some documentary evidence is required. *Moghanian v. United States Department of Justice,* 577 F.2d 141, 142 (9th Cir.1978). We have also said that general evidence of widespread conditions of violence affecting all residents of a country is not, by itself, sufficient. *Zepeda-Melendez,* 741 F.2d at 290; *Martinez-Romero v. INS,* 692 F.2d 595, 595–96 (9th Cir.1982). Most recently we held that an alien's youth, his family's ownership of a strategically located house, and his lack of commitment to either side in the Salvadoran struggle was insufficient to distinguish the danger he faced from that confronting other Salvadorans. *Zepeda-Melendez,* 741 F.2d at 290.

Unlike the petitioner in *Zepeda-Melendez,* Bolanos did not present only general evidence of conditions that affect all Salvadorans equally or that merely raise a possibility that he, like almost all others, could be subject to the violent terror common in his homeland. Bolanos's general evidence, newspaper articles that demonstrate the political and social turmoil in El Salvador, was coupled with testimony about a specific threat to his life made by the guerrillas. Neither the Immigration Judge nor the Board of Immigration Appeals questioned Bolanos' credibility, or expressed any doubt about whether this threat had actually been made. But the Board concluded that the specific threat against Bolanos' life was merely "representative of the general conditions in El Salvador," while the Immigration Judge considered the specific, individualized evidence of the likelihood of persecution insufficient because not supported by "independent corroborative evidence." We disagree with both these views.

15. For example, in neither *Shoaee v. INS,* 704 F.2d 1079, 1084 (9th Cir.1983), nor *Martinez-Romero v. INS,* 692 F.2d 595, 595–96 (9th Cir. 1982), did the alien allege specific threats. In *Chavez v. INS,* 723 F.2d 1431, 1433 (9th Cir. 1984), we determined that the Board of Immigration Appeals did not abuse its discretion when it determined that a former security guard, Lopez, who was harassed one evening by men shouting and knocking on his door, had not satisfied the requirements of § 243(h). We applied an abuse of discretion standard because the asylum claim was made on a motion to reopen deportation proceedings. *Id.* at 1433. Without determining whether that standard of review is appropriate in the reopening context, *see Shoaee,* 704 F.2d at 1084 n. 4 (reviewing motion to reopen based on § 243(h) claim un-

■ The Board's conclusion that the threat against Bolanos' life was insufficient simply because it was representative of the general level of violence in El Salvador constitutes a clear error of law. We are mystified by the Board's ability to turn logic on its head. While we have frequently held that general evidence of violence is insufficient to trigger section 243(h)'s prohibition against deportation, not once have we considered a specific threat against a petitioner insufficient because it reflected a general level of violence.[15] Even when the credibility of a petitioner's evidence has been questioned, we have rejected the categorization of evidence of specific threats as "general." *See Zavala-Bonilla,* 730 F.2d at 565; *McMullen,* 658 F.2d at 1319. It should be obvious that the significance of a specific threat to an individual's life or freedom is not lessened by the fact that the individual resides in a country where the lives and freedom of a large number of persons are threatened. If anything, as we point out *infra,* that fact may make the threat more serious or credible.

■ Similarly, we cannot agree with the Immigration Judge that Bolanos must present independent corroborative evidence of the specific threat to his life. *Cf. Reyes v. INS,* 673 F.2d 1087, 1090 (9th Cir.1982) (requirement of corroborating affidavits to support claim of extreme hardship made in motion to reopen deportation proceedings imposes an unnecessarily heavy evidentiary burden). We recognize that omitting a corroboration requirement may invite those whose lives or freedom are not threatened

der substantial evidence test), we note that outside the reopening context, we review § 243(h) determinations under a substantial evidence test rather than the more limited abuse of discretion standard. In any event, the Board did not consider the past threats as evidence of general conditions in El Salvador. It determined, instead, that they were not related to Lopez's political opinions and that Lopez had failed to demonstrate that his life would be in danger if he returned to El Salvador. The evidence supported the conclusion that he was subjected to harassment solely because the harassers wanted the gun which they assumed that he, as an armed security guard, possessed, and that the harassment would not recur because he had left his security guard position.

to manufacture evidence of specific danger. But the imposition of such a requirement would result in the deportation of many people whose lives genuinely are in jeopardy. Authentic refugees rarely are able to offer direct corroboration of specific threats. "[I]t is difficult to imagine what other forms of testimony the petitioner[s] could present other than [their] own statement[s]." *McMullen*, 658 F.2d at 1319; *accord Zavala-Bonilla*, 730 F.2d at 565. Persecutors are hardly likely to provide their victims with affidavits attesting to their acts of persecution.

Interpreting the "objective evidence" requirement in the manner suggested by the Immigration Judge would erect a "virtually insuperable barrier to the attainment of refugee status." *Developments in the Law—Immigration Policy and the Rights of Aliens*, 96 Harv.L.Rev. 1286, 1355 (1983). If the alien's own testimony about a threat, when unrefuted and credible, were insufficient to establish the fact that the threat was made, it would be "close to impossible for [any political refugee] to make out a § 243(h) case." *McMullen*, 658 F.2d at 1319 (citing United Nations High Commissioner for Refugees, *Handbook on Procedures and Criteria for Determining Refugee Status* ¶ 196, at 47 (1979)).

█ Still, the mere fact that a threat was made may not be sufficient to establish a clear probability of persecution. Whether it is "more likely than not that the alien would be subject to persecution," *Stevic*, 104 S.Ct. at 2498, may depend on whether the threat is a serious one—whether there is reason to take the threat seriously. What matters is whether the group making the threat has the will or the ability to carry it out. It is here that general corroborative evidence, such as documentary evidence, may be most useful.

█ Evaluating the seriousness of the threat to Bolanos' life involves a consideration of the past response of the guerrillas to those who politically oppose them or who do not join in their political struggle. *See McMullen*, 658 F.2d at 1318. Bolanos testified that five of his friends were killed because they refused to join the guerrillas'

political cause. He also testified that his brother was pressed into the service of the guerrillas and may have been killed by them. The newspaper articles introduced by Bolanos note the violent retribution that may follow the expression of political views in El Salvador and the executions conducted in retaliation for refusals to join political guerrilla groups. This general documentary evidence supports Bolanos' contention that he would suffer political persecution if he returned to El Salvador. *See Zavala-Bonilla*, 730 F.2d at 565–66.

Given the general climate of uncontrolled violence in El Salvador, it would be unreasonable to conclude that the threat to Bolanos' life or freedom was not a serious one. Because he refused to join their cause and infiltrate the government on their behalf, the guerrillas are likely to consider him a political opponent, just as they would if he had spoken out publicly in opposition to their cause or tactics. *See McMullen*, 658 F.2d at 1318 (general documentary evidence of pattern of PIRA persecution of defectors relevant in determining whether former PIRA member was likely to face persecution upon deportation). The evidence clearly shows that the guerrillas have the ability and the will to carry out their threats.

## B. *Political Opinion*

█ The government concedes that Bolanos has consciously chosen not to join either of the contending forces in El Salvador because he wishes to remain neutral, yet it argues that any persecution Bolanos might suffer would not be because of his political opinion. We find it somewhat difficult to follow the government's argument. The government contends that Bolanos' decision to remain politically neutral is not a political choice. There is nothing in the record to support this contention. Presumably the government is suggesting either that neutrality is always apolitical or that an individual who chooses neutrality must establish that the choice was made for political reasons. We disagree with both of these contentions.

Choosing to remain neutral is no less a political decision than is choosing to affili-

ate with a particular political faction. Just as a nation's decision to remain neutral is a political one, *see, e.g.,* Neutrality Act of 1939, 22 U.S.C. §§ 441–465 (1982), so is an individual's. When a person is aware of contending political forces and affirmatively chooses not to join any faction, that choice *is* a political one. A rule that one must identify with one of two dominant warring political factions in order to possess a political opinion, when many persons may, in fact, be opposed to the views and policies of both, would frustrate one of the basic objectives of the Refugee Act of 1980 —to provide protection to all victims of persecution regardless of ideology.[16] Moreover, construing "political opinion" in so short-sighted and grudging a manner could result in limiting the benefits under the ameliorative provisions of our immigration laws to those who join one political extreme or another; moderates who choose to sit out a battle would not qualify.

■ The government's second suggestion is equally unconvincing. The motive underlying any political choice may, if examined closely, prove to be, in whole or in part, non-political. Certainly a political affiliation may be undertaken for non-political, as well as political, reasons. A decision to join a particular political party may, for example, be made to curry favor, gain social acceptability, advance one's career, or obtain access to money or positions of power. Similarly, a decision to remain neutral may be made, in whole or in part, for non-political reasons. However, the reasons underlying an individual's political choice are of no significance for purposes of sections 243(h) and 208(a) and the government may not inquire into them.

Whatever the motivation, an individual's choice, once made, constitutes, for better or for worse, a manifestation of political opinion.

We have several reasons for reaching the conclusion that the government may not look behind the manifestation of an alien's political opinion and seek to determine why he made a particular political choice. First, it is simply improper for the government to inquire into the motives underlying an individual's political decisions.[17] Second, the motives frequently will be both complex and difficult to ascertain; it may not be possible to separate the political from the non-political aspects. What standards would we use, for example, to determine whether a choice was sufficiently based on political principles or whether economic self-interest was the determinative factor? Third, and perhaps most important, it is irrelevant why the individual made his choice. It does not matter to the persecutors what the individual's motivation is. The guerrillas in El Salvador do not inquire into the reasoning process of those who insist on remaining neutral and refuse to join their cause. They are concerned only with an act that constitutes an overt manifestation of a political opinion. Persecution because of that overt manifestation is persecution because of a political opinion.

Here, Bolanos was quite aware of the political situation. He had severed his ties to the right-wing organizations with which he had been affiliated. However, he subsequently refused to join the guerrillas despite their threats to his life. By choosing neutrality and refusing to join a particular political faction, Bolanos expressed his opinion and took a political stance. That conduct is as much an affirmative expres-

16. *See* S.Rep. No. 256, 96th Cong., 2d Sess. 1, 3, *reprinted in* 1980 U.S.Code Cong. & Ad.News 141, 142, 144; H.R.Rep. No. 96–608, 96th Cong., 1st Sess. 1 (1979); *Refugee Act of 1979: Hearings on H.R. 2816 Before the Subcomm. on Immigration, Refugees, and International Law of the House Comm. on the Judiciary,* 96th Cong., 1st Sess. 21 (1979) (testimony of Griffin Bell, United States Attorney General).

17. Our constitution requires that an individual be able to "maintain his own beliefs without public disclosure," *see Pruneyard Shopping Center v. Robins,* 447 U.S. 74, 100, 100 S.Ct. 2035,

2050, 64 L.Ed.2d 741 (1980), because the freedom to speak and the freedom to refrain from speaking are "complementary components of the broader concept of 'individual freedom of mind.'" *Wooley v. Maynard,* 430 U.S. 705, 714, 97 S.Ct. 1428, 1435, 51 L.Ed.2d 752 (1977) (quoting *Board of Education v. Barnette,* 319 U.S. 624, 637, 63 S.Ct. 1178, 1185, 87 L.Ed. 1628 (1943)). While this principle may not be directly applicable here, the reasons underlying the right of citizens to be free from similar governmental inquiries are certainly instructive.

sion of a political opinion as is joining a side, or speaking out for or against a side. *Cf. Spence v. Washington,* 418 U.S. 405, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974); *Shuttlesworth v. City of Birmingham,* 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969); *Tinker v. Des Moines School District,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); *Edwards v. South Carolina,* 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963); *Thornhill v. Alabama,* 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940) (examples of non-verbal political speech).[18]

 The evidence is uncontroverted that Bolanos is likely to be persecuted by a politically motivated group that frequently engages in terrorist tactics directed at those who refuse to join its armed political struggle. In light of Bolanos' refusal to join, and in light of the fact that his refusal represented a conscious political choice, the conclusion is inescapable that Bolanos' life is endangered because of his political opinion. Therefore, he may not be deported.

## IV. POLITICAL ASYLUM UNDER SECTION 208(a)

As we have previously said, *see supra* Section II, the section 208(a) well-founded-fear standard is more generous than the section 243(h) clear-probability standard. Accordingly, an alien who has met the clear-probability standard has, *a fortiori,* demonstrated a well-founded fear of persecution. For the same reasons that we find that Bolanos has established that section 243(h) precludes his deportation, we find that he has demonstrated a well-founded fear of persecution. Accordingly, Bolanos meets the eligibility requirements for a grant of asylum under section 208(a).

Because the Board erroneously determined that Bolanos was not eligible for asylum, the Attorney General has not had the opportunity to exercise his discretion in determining whether to grant this relief. We remand so that the Attorney General may now do so in accordance with the factors enumerated in 8 C.F.R. § 208.8 (1983).[19]

## V. CONCLUSION

The Board of Immigration Appeals erred as a matter of law when it concluded that specific threats are insufficient to establish a threat of persecution if they are representative of a general level of violence in a foreign country; so did the Immigration Judge when he concluded that specific threats must be independently corroborated. The Board erred again when it held that neutrality does not constitute a political opinion. Bolanos has introduced specific evidence that his life has been threatened because of his political opinion. Additionally, he has established, with the assistance of general documentary evidence, that this threat is a serious one. When the correct legal standards are applied, it is clear that the decision to deport Bolanos is not supported by substantial evidence; nor is the decision that he failed to meet the eligibility requirements for a grant of asylum. There is a clear probability that Bolanos would be subject to political persecution if he returned to El Salvador.

REVERSED AS TO SECTION 243(h) CLAIM; REVERSED AND REMANDED AS TO SECTION 208(a) CLAIM.

18. We recognize that, unlike the act of joining a side, a lack of political involvement may in some instances not represent a political choice. We need not decide, however, whether a mere failure to join any side, absent a conscious choice, represents a political decision. In this case it is clear that Bolanos has not simply failed to join either political side; he has made a deliberate and considered decision not to do so. Nor need we decide here whether the mere refusal to join a *particular* side, absent more, constitutes the expression of a political opinion. Here, Bolanos made a choice of an affirmative

political stance—neutrality. We leave to another time the question whether a purely negative choice—a simple rejection of a particular political group—necessarily reflects a "political opinion."

19. Because a grant of asylum provides the alien with benefits that are not automatic with a grant of relief under § 243(h), *see, e.g.,* 8 C.F.R. § 209.2 (1984) (after one year, alien may apply for readjustment of status to permanent resident alien), the petitioner may wish to be granted asylum in addition to the § 243(h) relief.