Sergio Augusto GOMEZ–SABALLOS; Rosa Virginia Martinez De Gomez; Waskar Augusto Gomez Martinez; Jorge Francisco Gomez Martinez; Jennyfer Del Socorro Gomez Martinez, Petitioners,

v.

IMMIGRATION AND NATURALIZATION SERVICE, Respondent.

No. 94–70534.

United States Court of Appeals, Ninth Circuit.

Submitted Jan. 10, 1996. *

Decided March 22, 1996.

---

* The panel finds this case appropriate for submission without argument pursuant to Fed. R.App. P. 34(a) and Ninth Circuit Rule 34–4.

Milton Dan Kramer, Kramer & Miyashita, San Francisco, CA, for petitioners.

April Gordon Dawson, Office of Immigration Litigation, U.S. Dept. of Justice, Washington, DC, for respondent.

Before LAY,** CHOY and PREGERSON, Circuit Judges.

LAY, Circuit Judge:

■ The lead petitioner is Sergio Augusto Gomez–Saballos, who seeks review of the Board of Immigration Appeals (BIA) order denying his application for withholding of deportation and political asylum under 8 U.S.C. §§ 1253(h) and 1158(a).[1] We must uphold the BIA's determination that petitioner is not eligible for asylum and withholding of deportation if the BIA's finding is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." 8 U.S.C. § 1105a(a)(4). We conclude under the unusual facts of this case the BIA has misapplied the governing standards to the facts before it, that substantial evidence on the record as a whole demonstrates without equivocation that the petitioner's "life ... would be threatened ... on account of ... political opinion" if required to return to Nicaragua, and that the petitioner is thus entitled to withholding of deportation under § 1253(h). It follows that the petitioner is also eligible for asylum under the lesser "well-founded fear of persecution" standard under § 1158(a). *See* 8 U.S.C. § 1101(a)(42)(A) (defining "refugee").

*Controlling Standards*

In a trilogy of cases, the Supreme Court has clarified the standards of review which govern a petition of asylum under § 1158(a) and a claim for withholding of deportation under § 1253(h). In *INS v. Stevic*, 467 U.S. 407, 104 S.Ct. 2489, 81 L.Ed.2d 321 (1984), the Court found that § 1253(h) "literally provides for withholding of deportation only if the alien's life or freedom 'would' be threatened in the country to which he would be deported." *Id.* at 422, 104 S.Ct. at 2497. The Court explained that an application for withholding of deportation must "be supported by evidence establishing that it is more likely than not that the alien would be subject to persecution on one of the specified grounds." *Id.* at 429–30, 104 S.Ct. at 2501.

In *INS v. Cardoza–Fonseca*, 480 U.S. 421, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987), the Court made clear that a request for asylum under § 1158(a), which requires the petitioner to show a well-founded fear of persecution, does not contain the requirement that it is "more likely than not" that the alien will be subject to persecution upon deportation. *Id.* at 431, 107 S.Ct. at 1212–13. The Court explained that "[o]ne can certainly have a well-founded fear of an event happening when there is less than a 50% chance of the occurrence taking place." *Id. Cardoza–Fonseca* further explained that the "more likely than not" standard requires an objective basis, while the "well-founded fear" standard "turn[s] to some extent on the subjective mental state of the alien." *Id.* at 430–31, 107 S.Ct. at 1212. Finally, in *INS v. Elias–Zacarias*, 502 U.S. 478, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992), the Court clarified that in order to succeed in a claim for asylum under § 1158(a), an applicant must show that his fear of persecution is on account of the applicant's race, religion, nationality, membership in a particular social group, or political opinion. *Id.* at 481–82, 112 S.Ct. at 815–16. *Elias–Zacarias* made clear that this court cannot reverse the BIA unless a reasonable factfinder would be compelled to find the petitioner eligible for the relief sought. *Id.* at 483–84, 112 S.Ct. at 816–17. Thus, for petitioner to succeed under § 1253(h), he must demonstrate more than a well-founded subjective fear of persecution: he must establish by compelling proof that, viewed objectively, he is more likely than not to be persecuted because of his own political beliefs.

*Facts*

Gomez–Saballos is a forty-one-year-old citizen of Nicaragua who entered the United States without inspection on November 6, 1984. In 1987, he applied for asylum. In 1989, the Immigration and Naturalization Service (INS) sought to deport Gomez–Sa-

---

** Honorable Donald P. Lay, Senior Circuit Judge for the Eighth Circuit, sitting by designation.

1. Gomez-Saballos's petition is joined derivatively by his wife and their three minor children. *See* 8 U.S.C. § 1158(c); 8 C.F.R. § 208.21 (1995).

ballos, and he renewed his application for asylum.[2]

At his asylum hearing, Gomez–Saballos testified he joined the Sandinistas in 1975 with his brothers, Jorge and Oscar, in the revolt against the Somoza regime in Nicaragua. Admin.Rec. at 96, 151. In 1979, Ramon Soliz, a long-time acquaintance and former neighbor of Gomez–Saballos known as "Chupamango," joined the fighting against the Somoza regime with Gomez–Saballos and his brothers. *Id.* at 105, 151. Chupamango, who turned out to be an informer for Somoza's National Guard, revealed the identity of one brother, Jorge, to the National Guard. As a result, Jorge was executed. *Id.* at 106–07, 152.[3] After the Sandinistas took power, Chupamango was apprehended and showed Gomez–Saballos where Jorge was buried. *Id.* at 107, 152. The Sandinistas convicted Chupamango of war crimes and sentenced him to thirty years imprisonment. Upon his imprisonment, Chupamango threatened to kill Gomez–Saballos and his other brother, Oscar. *Id.* at 117–18.[4]

In 1980, the Sandinistas installed Gomez–Saballos as the director of a prison in Boaca, Nicaragua, where he was responsible for supervising more than two hundred former officers and soldiers of Somoza's National Guard. *Id.* at 99–100, 153. One of Gomez–Saballos's duties was to educate the prisoners about the violent and abusive practices of the Somoza regime, in an effort to rehabilitate them. *Id.* at 101, 153. Gomez–Saballos stated he "cannot forget the hatred for me that shone in the eyes of these men" during education sessions. *Id.* at 153. Gomez–Saballos testified he never mistreated the prisoners, but many threatened vengeance against him due to "clash[es] with the higher ranking [National Guard] officials over political opinions" and because he refused to accept their bribes to obtain early release. *Id.* at 102–03, 154. Gomez–Saballos was the Boaca prison director until assigned to a school for Marxist training in 1983. He disa-

greed with Marxist philosophy, and because of his political beliefs, Gomez–Saballos fled Nicaragua for the United States. He asserted to the BIA that his disagreement with the Sandinista Regime "was known to them." *Id.* at 58.

In 1989, a general amnesty took effect which liberated Chupamango and most of the other prisoners Gomez–Saballos supervised from 1980 to 1983. *Id.* at 117, 118. Gomez–Saballos testified that a friend told him Chupamango blames him for his long prison term and that Chupamango recently came to the neighborhood in which Gomez–Saballos formerly lived looking for him. *Id.* at 109. In his affidavit, Gomez–Saballos stated Chupamango is "waiting for my return to kill me for turning him in to the Sandinista forces," and that Chupamango is "said to belong to an organization of ex-National Guardsmen who are seeking to regain their former status in Nicaragua by force, if necessary." *Id.* at 155. Gomez–Saballos explained Chupamango seeks to kill him "because of political matters, political business all the time." *Id.* at 122. Another friend told Gomez–Saballos not to return to Nicaragua because several former prisoners from the Boaca prison have asked about him and threatened to kill him. *Id.* at 109–10. Gomez–Saballos also stated the Sandinistas consider him a deserter and may try to harm him if he is forced to return to Nicaragua. *Id.* at 120. Gomez–Saballos testified, however, his greatest fears were of the "ones that were on my charge, under my care" at the Boaca prison. *Id.* at 110.

The immigration judge (IJ) determined Gomez–Saballos had failed to meet his burden of showing eligibility for the relief sought, in part because the IJ found Gomez–Saballos had "participated in the persecution" of others as director of the Boaca political prison. *See* 8 U.S.C. §§ 1101(a)(42), 1253(h)(2)(A). On appeal, the BIA expressly rejected the IJ's finding that Gomez–Saballos was ineligible for relief because he participat-

---

**2.** An application for asylum is deemed to be an application for withholding of deportation. *See* 8 C.F.R. § 208.3(b) (1995).

**3.** Gomez–Saballos, who was present at the time Jorge was identified, was not seen and escaped capture. *Id.* at 107.

**4.** Oscar obtained asylum in the United States in February 1990. *Id.* at 126.

ed in the persecution of others, but affirmed after a *de novo* review of the record. Admin.Rec. at 2.

*The BIA's Findings*

First, the BIA rejected Gomez–Saballos's claim of a well-founded fear of persecution by the Sandinistas due to the desertion of his position as the prison director, holding that "the need to discipline deserters is not persecution on account of political opinion," and noting that the Sandinistas had been succeeded in power by a coalition government.[5] *Id.* at 5. Second, the BIA rejected Gomez–Saballos's claim he faced retribution by the prisoners he had supervised. The BIA reasoned this claim lacked a basis in fact due to Gomez–Saballos's testimony that he always treated the inmates fairly and justly, and also because he lacked supporting evidence to show that the prison officials who replaced him were subject to persecution by former prisoners. *Id.* Third, the BIA rejected his claim of a well-founded fear of persecution by Chupamango. Relying on *Blanco–Comarribas v. INS,* 830 F.2d 1039 (9th Cir.1987), and *Pierre v. Rivkind,* 825 F.2d 1501 (11th Cir. 1987), the BIA concluded that "individual vengeance" provides no basis for asylum. Admin.Rec. at 5. The BIA also stated Gomez–Saballos offered no evidence that Chupamango had threatened others also responsible for Chupamango's imprisonment. *Id.* The BIA thus found Gomez–Saballos ineligible for asylum and withholding of deportation. This petition followed.

*Analysis*

■■■ The credible evidence of politically motivated death threats against Gomez–Sa-

ballos by the former prisoners is compelling evidence that Gomez–Saballos's life would be threatened by reason of his own political opinion. The BIA discounted this evidence on the ground that Gomez–Saballos's fear of the former National Guard members whom he supervised at the Boaca prison lacked a basis in fact because he testified he treated them fairly and justly. The fact that a prison director treats his inmates fairly is hardly a substantial basis for *assuming* the prisoners do not resent his politically motivated rehabilitation efforts as prison director and his refusal to accept their bribes. We also find it was not incumbent upon Gomez–Saballos to produce evidence that subsequent prison directors were threatened by the same prisoners in order to establish an objective basis for threats on his life. This type of particularized evidentiary burden would be too great for an alien who has fled his native country and cannot obtain information through official governmental sources. *See Bolanos–Hernandez v. INS,* 767 F.2d 1277, 1285 (9th Cir.1984) (holding that petitioner does not need to "present independent corroborative evidence of the specific threat to his life" due to difficulties in obtaining such evidence from country of persecution).[6] Instead, Gomez–Saballos established his life would be threatened on account of his political opinion through specific testimony about the prisoners' threats and the current political associations of the prisoners, and other documentary evidence showing that Nicaragua is experiencing continuing politically motivated violence.[7] This documentary evidence about general conditions in Nicaragua

---

**5.** The INS also urges there is no evidence the Sandinistas knew of Gomez–Saballos's political dissatisfaction with them.

**6.** The government, relying on *Rodriguez–Rivera v. U.S. Dep't of Immigration & Naturalization,* 848 F.2d 998 (9th Cir.1988), argues Gomez–Saballos must show his fear is objectively reasonable based on "credible, direct, and specific evidence in the record." *Id.* at 1002 (quotations omitted). We note that in *Rodriguez–Rivera,* the court upheld the BIA's denial of asylum because the petitioner's claim of a death threat was no longer objectively reasonable because the person making the threat had died. *Id.* at 1006. In addition, the court said the BIA was allowed to consider the fact that the petitioner had lived "undisturbed" in the country for two months

despite the death threat. *Id.* By contrast, Gomez–Saballos left Nicaragua before the ex-National Guardsmen were released from prison, and provided specific testimony that former prisoners were still actively seeking his presence to carry out their threats.

**7.** Although not part of the record below, we note that the U.S. State Department's report on Nicaragua for 1993 showed a large number of killings by anti-Sandinista groups. *See, e.g.,* U.S. Dep't of State, *Country Reports on Human Rights Practices* for 1993, at 504 (Feb.1994). Although conditions have apparently improved, there have still been 161 killings of former combatants from Nicaragua's civil war since 1993. *See Democracy in Nicaragua: Hearings Before the Subcomm. on Western Hemisphere Affairs of the House*

also reasonably supports Gomez–Saballos's contention that Nicaragua's current government is unable to control organized former National Guard members. *See Bolanos–Hernandez,* 767 F.2d at 1284.

Gomez–Saballos occupied a politically-assigned position of prison director. He also had the politically-charged task of supervising the rehabilitation of the prisoners. He stated that his efforts at rehabilitation created "hatred for me" among the prisoners. To those imprisoned, he clearly represented the person in charge of their political incarceration. The prisoners represented an organized political force in opposition to the political views of the Sandinistas. The death threats to him by those imprisoned cannot be separated from his political position and the obvious perception to the prisoners that, as the person in charge of their custody, he adhered to political beliefs in opposition to their own. It is far from illogical that the prisoners would assume Gomez–Saballos, as director of the prison, occupied a heightened political role in the revolutionary government. It is reasonable to infer that he, above all others, would become targeted by the prisoners as representing all that was politically wrong with the Sandinista government. The evidence presented compels a conclusion that Gomez–Saballos's life would be threatened on account of his political beliefs and actions.[8]

The risks Gomez–Saballos faces from Chupamango and the Sandinistas bolster our conclusion that Gomez–Saballos faces a clear probability of persecution under 8 U.S.C. § 1253(h).

■■■ We do not think the BIA had a substantial basis for characterizing Chupamango's threats against Gomez–Saballos as mere "individual vengeance." The BIA's conclusion is contrary to this court's opinion in *Blanco–Lopez v. INS,* 858 F.2d 531, 533–34 (9th Cir.1988), which held that despite the personal origins of a dispute, death threats by people on one side of a civil war against a

person suspected of being on the other side constituted persecution on account of political opinion. The fact that Gomez–Saballos and Chupamango were on opposite sides of the revolutionary war in Nicaragua, and that Chupamango was responsible for the execution of Gomez–Saballos's brother *as a Sandinista revolutionary,* is sufficient to demonstrate the ideological origins of the dispute between the two men. Gomez–Saballos also stated that Chupamango now belongs to an organization of former National Guard members seeking to regain power by force. In light of this statement, and the general country conditions in Nicaragua, it is reasonable to infer that Chupamango is seeking to kill Gomez–Saballos not just for personal vengeance but also to advance the counter-revolutionary political ideas he obviously shares with the former National Guardsmen with whom he is associated.

*Blanco–Comarribas v. INS,* 830 F.2d 1039 (9th Cir.1987), and *Pierre v. Rivkind,* 825 F.2d 1501 (11th Cir.1987), on which the BIA relied, are not to the contrary. *Blanco–Comarribas* does not even address the issue of "individual vengeance." In *Blanco–Comarribas,* this court reversed the BIA's determination that the petitioner was ineligible for asylum in part because the petitioner's father was killed and other relatives had been arrested and threatened with imprisonment or death. 830 F.2d at 1043. The fact that Gomez–Saballos has been individually threatened by Chupamango, and has shown that a close relative was executed by the National Guard, at Chupamango's initiative, is strong evidence under *Blanco–Comarribas* in support of a claim for relief.

*Pierre* did address the issue of personal vengeance, but did not hold that matters of personal vengeance could never constitute persecution on account of political opinion. In *Pierre,* a habeas corpus proceeding, the district court actually held that the BIA erred by characterizing a dispute over a mule between a petitioner's father and a Haitian

---

*Comm. on International Relations,* 1995 WL 11869286 (Nov. 8, 1995) (testimony of Anne W. Patterson, Deputy Assistant Secretary of State for Inter–American Affairs).

**8.** The fact that Gomez–Saballos was the politically-assigned director of the prison, made his political opinions known to the prisoners through

leading the efforts at rehabilitation, and stated that "hatred for me ... shone in the eyes" of the prisoners during rehabilitation sessions is the type of circumstantial evidence of his persecutor's motives that was lacking in *Elias–Zacarias,* 502 U.S. at 483, 112 S.Ct. at 816–17.

security official as "personal rather than political." 825 F.2d at 1505. The Eleventh Circuit reversed, but on the basis that the petitioner "failed to provide any evidence that there currently exists any dispute, political or otherwise, between her family and the [security official]." *Id.* In this case, by contrast, Gomez–Saballos testified about the political origins of the dispute between himself and Chupamango, the politically motivated execution of his brother, and the recent inquiries by Chupamango about his whereabouts. This evidence supports Gomez–Saballos's fear of persecution by Chupamango on the basis of political opinion.

Finally, the fact that Gomez–Saballos could be harassed or injured by the Sandinistas adds to the probability of persecution upon his return to Nicaragua. The general documentary evidence in the record shows the Sandinistas continue to harass and threaten those opposed to their beliefs. Although a bare allegation that his political disagreement with the Sandinistas was "known to them" is, by itself, insufficient to establish entitlement to withholding of deportation or eligibility for asylum, *see Elias–Zacarias,* 502 U.S. at 483, 112 S.Ct. at 816–17, the risks Gomez–Saballos would face from the Sandinistas if deported to Nicaragua provides additional support for our decision.

Given our conclusion that Gomez–Saballos has established a clear probability of persecution on account of his political opinions, he may not be deported. It follows that Gomez–Saballos is also eligible for asylum under the less stringent "well-founded fear of persecution" standard.[9] *See Blanco–Lopez,* 858 F.2d at 534.

REVERSED and REMANDED.

---

9. Gomez–Saballos has clearly met the "well-founded fear of persecution" standard. Given the political execution of his brother and the threats made by the political prisoners and Chupamango, there is a compelling basis for Gomez–Saballos to fear for his safety on the basis of his political beliefs. *See Cardoza–Fonseca,* 480 U.S. at 431, 107 S.Ct. at 1212–13.

On remand, the Attorney General should determine, in the exercise of discretion, whether to grant asylum to Gomez–Saballos. 8 U.S.C. § 1158(a). This remand is necessary to determine whether Gomez–Saballos will qualify for benefits attendant only to a grant of asylum. *See, e.g., Artiga Turcios v. INS,* 829 F.2d 720, 724 (9th Cir.1987) (noting opportunity to apply for permanent resident status under 8 U.S.C. § 1159(b) for those aliens granted asylum).